Slip Op. 13-74

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____
:
GOLD EAST PAPER (JIANGSU)          :
CO., LTD.; NINGBO ZHONGHUA         :
PAPER CO., LTD.; and               :
GLOBAL PAPER SOLUTIONS             :
                                   :
            Plaintiffs,            :
                                   :
        v.                         :        Before: R. Kenton Musgrave, Senior Judge
                                   :        Consol. Court No. 10-00371
UNITED STATES,                     :
                                   :
            Defendant,             :
                                   :
        and                        :
                                   :
APPLETON COATED LLC, et al.        :
                                   :
        Defendant-Intervenors.     :
_____:

## OPINION

[Commerce's determination is upheld in part and remanded in part.]

Dated: June 17, 2013

*Daniel L. Porter, James P. Durling, Matthew P. McCullough* and *Ross Bidlingmaier*, Curtis Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., for plaintiff.

*Alexander V. Sverdlov*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With him on the brief were *Stewart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director. Of counsel on the brief was *Mykhaylo Gryzlov*, Senior Attorney, and *Melissa Brewer*, Office of Chief Counsel for Import Administration, U.S. Department of Commerce.

*William A. Fennell, Wesley K. Caine* and *Terence P. Stewart*, Stewart & Stewart, of Washington, D.C., and *Gilbert B. Kaplan*, *Daniel L. Schneiderman* and *Christopher T. Cloutier*, King & Spalding, of Washington D.C. for defendant-intervenors.

**Musgrave, Senior Judge**:  Plaintiffs Gold East Paper (Jiangsu) Co., Ltd. ("Gold East"), Ningbo Zhonghua Paper Co., Ltd., and Global Paper Solutions ("GPS") (hereafter "Plaintiffs" or "APP-China") challenge the Department of Commerce's ("Commerce") final determination in the antidumping investigation of *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China*, 75 Fed. Reg. 59217 (Dept. Commerce, Sept. 27, 2010) Public Record Doc. ("PR") 360, *as amended by Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Amended Final Determination of Sales at Less than Fair Value and Antidumping Order*, 75 Fed. Reg. 70203 (Dept. Commerce, Nov. 17, 2010), PR 369 (collectively, "Final AD Order").

In their second amended complaint, plaintiffs press multiple causes of action, which are addressed below.  Second Amended Complaint, dated December 19, 2012, and filed on January 10, 2013, ECF Doc. 114-1, at 9-12; *see also* Plaintiff's Reply Brief ("Pl's Reply") at 1 (identifying which arguments plaintiff is no longer pursuing).  Plaintiffs move for judgment under Rule 56.2, challenging the Final AD Order in five sections of their brief.  Respondent Plaintiffs' Brief in Support of Their Motion for Judgment on the Agency Record (Confidential) ("Pl's Br.") at 1-4.

Defendant-Intervenors Appleton Coated LLC, Newpage Corp., SAPPI Fine Paper North America, *et al* ("Appleton") cross-move for judgment under Rule 56.2, alleging that Commerce misclassified certain U.S. sales as Export Price transactions, not Constructed Export Price transactions due to the sales' locations and delivery terms.  Appleton also claims that

Commerce erred in determining the surrogate wage rate for purposes of its Non-Market Economy Normal Value calculations.

The government defends Commerce's findings generally, but does agree to a voluntary remand in order to review the computer programming and to make any changes required to correct any errors found.  Due to the multitude of issues involved, the relevant facts are discussed with each issue separately.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  Commerce's final determination will be upheld unless it is found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).

Separately, the two-step framework provided in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. *See United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous").  Commerce's interpretation will not be set aside unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778.

## ANALYSIS

**I.     Commerce's Refusal to Use Market Economy Input Prices where Such Inputs did not Constitute More than 33 Percent of Plaintiffs' Purchases**

In order to determine the proper antidumping margin, Commerce valued the raw material inputs used in the manufacture of the merchandise.  Commerce decided not to use the market-economy ("ME") price paid for those inputs where ME purchases made up less than 33% of those inputs.  Instead, Commerce used a price based on the weighted-average ME price plus a surrogate value for the non-market economy ("NME") purchases.  Cmt. 18, Issues & Decision Memorandum ("I&D Memo") (Sept. 20, 2010) PR 353 at 46.  The record shows that 32.9% of certain disputed inputs were ME purchases.  Pl's Br. at 23 (chart).

Commerce does not expressly defend the decision, but does defend the 33% policy as an "objective benchmark" which provides "consistency and predictability" in Commerce's determinations.  Defendant's Response to Plaintiffs' and Defendant-Intervenors' Separate Motions for Judgment Upon the Administrative Record ("Deft's Br.") at 44.  Its brief summarizes the administrative history of the 33% policy and suggests that APP-China could have but failed to prove to Commerce that "case specific facts favor the application of a different threshold".[1]  In the I&D Memo, Commerce cites to prior cases where it applied the 33% policy, but a review of those cases does not reveal how close to 33% the ME input purchases were.  *See* I&D Memo at 46, n. 140-141.

Under Commerce's regulations, it will "normally" use prices paid by NME

---

[1]     *Id*.  APP-China attempted unsuccessfully to prove to Commerce that the 33% "presumption" should be rebutted by emphasizing the *bona fides* of the market transactions, as well as the fact that Commerce had verified the accuracy of the prices involved.  I&D Memo at 47.

producers to ME suppliers to value factors of production in Normal Value calculations.  *See* 19

C.F.R. § 351.408(c)(1).   Commerce's policy implementing § 351.408(c)(1) is to use the ME

purchase price to value the particular factor where the ME purchases are a "significant" or

"meaningful" portion of the whole.  *See Antidumping Methodologies: Market Economy Inputs,*

*etc.*, 71 Fed. Reg. 61716, 61716-19 (Dep't Comm. Oct. 19, 2006).   Under this policy, the ME

inputs constitute a "significant" or "meaningful" portion where they make up more than 33% of

purchases of the input.  *Id.*, 71 Fed. Reg. at 61717-18.  Above the 33% threshold, Commerce will

use the ME price to value the entire quantity of inputs.  Below that threshold Commerce will use

a weighted average of the ME price for the ME portion and a surrogate value for the remainder

as it did in this case.

    The government argues that *Shakeproof Assembly Comp. Div. of Ill. Tool Works,*

*Inc. v. United States*, 268 F.3d 1376 (Fed. Cir. 2001), which predates Commerce's 33% policy,

"upheld Commerce's determination that actual input prices will constitute the 'best information

available' only if they are found in a 'meaningful' quantity."  Deft's Br. at 48.  That court stated:

> In determining the valuation of the factors of production, the critical question is
> whether the methodology used by Commerce is based on the best available
> information and establishes antidumping margins as accurately as possible.
> Commerce argues that the actual price paid for inputs imported from a market
> economy in meaningful quantities is the best available information and promotes
> accuracy in the dumping calculation.   Commerce notes that the value of the
> factors of production for domestically purchased merchandise may be obtained by
> extrapolating the market economy import price only when a "meaningful" amount
> of merchandise is imported.  Although we recognize that the level of a
> "meaningful" amount of imported merchandise must be determined on a case-by-
> case basis, we are persuaded that the steel imported from the United Kingdom in
> this case constitutes a "meaningful" amount. The steel imported from the United
> Kingdom constitutes approximately one-third of all steel used . . . .

*Shakeproof*, 268 F.3d at 1382.  In *Shakeproof*, Commerce argued that the ME data was more

accurate that the surrogate data.  *Id*.  The *Shakeproof* court agreed.

> [W]here we can determine that a [non-market economy] producer's input prices
> are market determined, accuracy, fairness, and predictability are enhanced by
> using those prices. Therefore, using surrogate values when market-based values
> are available would, in fact, be contrary to the intent of the law.

*Shakeproof*, 268 F.3d at 1382, *quoting Lasko Metal Products, Inc. v. United States*, 43 F.3d

1442, 1446.  The court finds the reasons why Commerce sought to use the ME data in

*Shakeproof* compellingly favor APP-China's position in this case.

        The Oxford English Dictionary defines "meaningful" (as applied to data or its

presentation), as "accurate and realistic; of practical use."[2]  Commerce's policy, delineated

following the *Shakeproof* decision, defines 33% as a "meaningful" and "significant" amount.

The court cannot understand why, in Commerce's view, purchases of 33% of an input are

"meaningful", but purchases of 32.9% are not.  There is no meaningful distinction for purposes

of determining Normal Value between those two quantities.  Commerce itself has said that the

33% rule was *not* a "rigid, 'bright line' threshold".  *Antidumping Methodologies: Market

Economy Inputs*, 71 Fed. Reg. at 61718.

        The court finds that Commerce's refusal to value the classes of inputs using the

ME price paid for 32.9% of those inputs, where it would have done so if APP-China had made

ME purchases of 33% of the input, is unreasonable, arbitrary and capricious under the

circumstances.  This issue is therefore remanded to Commerce to recalculate the affected inputs

using the ME prices paid rather than the weighted averages previously used and to recalculate

---

[2]        Oxford    English    Dictionary,    Third    Edition,    2001,    found    at
http://www.oed.com/view/Entry/115468?redirectedFrom=meaningful#eid, last viewed on May
15, 2013.

the affected margins accordingly.

**II.     Commerce's Refusal to Recognize Market Economy Purchases of Inputs from Thailand and Korea**

Plaintiffs challenge Commerce's refusal to recognize APP-China's raw material imports from Korea and Thailand as *bona fide* market economy purchases, or to utilize their prices to value the raw material input.  Commerce made this decision because it believed that such inputs may themselves have been sold with the benefit of subsidies.  Deft's Br. at 16. Plaintiffs claim that this refusal is contrary to this court's precedent, citing *Fuyao Glass Indus. Group Co. v. United States*, 29 CIT 109 (2005) and *Sichuan Changong Elec. Co. v. United States*, 30 CIT 1481, 460 F.Supp. 2d 1338 (2006).

Under 19 U.S.C. § 1677b(c)(1) and 19 C.F.R. § 351.408(c)(1), Commerce normally will use the price paid to a market-economy producer to value a factor in valuing products exported from a NME such as the PRC.   *Fuyao Glass* and *Sichuan Changong* both questioned Commerce's refusal to use raw material values from Korea and Thailand due to Commerce's suspicions that those prices were tainted by possible export subsidies.

In *Fuyao Glass*, the court identified three factors to determine whether Commerce had a proper evidentiary basis to believe or suspect that the prices may have been subsidized.  On remand, the court ordered Commerce to justify the refusal to accept the raw material prices by demonstrating:

> by specific and objective evidence that (1) subsidies of the industry in question existed in the supplier countries during the period of investigation; (2) the supplier in question is a member of the subsidized industry or otherwise could have taken

advantage of any available subsidies; and (3) it would have been unnatural for a supplier to not have taken advantage of such subsidies.[3]

In *Sichuan Changhong* the court considered Commerce's finding that Korean and Thai inputs may have been subsidized and ordered Commerce to make findings under the *Fuyao Glass* criteria. *Sichuan Changhong*, 460 F.Supp. 2d at 1350-51. Upon remand, Commerce reopened the record and provided relevant evidence of the alleged subsidy programs.[4]

In this case, APP-China argued that Commerce must cite evidence establishing that the particular inputs were subsidized in fact. Commerce disagreed.

> [Commerce] is not required to conduct a formal investigation with respect to multiple countries to ensure that prices are subsidized. Rather, it is sufficient if [Commerce] has "substantial, specific, and objective evidence in support of its *suspicion* that the prices are distorted." *See China Nat'l Mach. Imp. & Exp. Corp. v. United States*, 293 F. Supp. 2d 1334, 1339 (CIT 2003) (emphasis in original); H.R. Conf. Rep. No. 100-576, at 590 [(1988), *reprinted in* 1988 U.S. Code, Cong., Admin. News 1547, 1623]. APP-China's suggestion that [Commerce] cannot rely upon its finding in other proceedings and is instead required to conduct a full blown reinvestigation of export subsidies in Thailand and Korea in the context of this antidumping duty investigation is unsupported and would [be] unadministrable, particularly in light of the statutory deadlines for completing antidumping investigations. Therefore, [Commerce] is instructed by Congress to base its decision on information that is available to it at the time it is making its determination.

Cmt. 17, I&D Memo at 44-45 (footnotes omitted).

Commerce tries to distinguish *Fuyao Glass* because there the court focused on Commerce's statement that it had found that prices were, rather than may have been, subsidized

---

[3]     *Fuyao Glass*, 29 CIT at 114. After remand, Commerce chose to use the contested ME input prices from Korea and Indonesia rather than reopen the record to establish evidence for its suspicion that the ME prices were subsidized. *See Final Results of Redetermination Pursuant to Court Remand* (Dept. Commerce June 9, 2005), ECF 122 in Ct. No. 02-00282 at 14.

[4]     See *Redetermination on Remand* (Dept. Commerce Feb. 12, 2007), ECF 104 in Ct. No. 04-00265 at 14-23.

in the countries in question.[5]   The court does not find Commerce's argument persuasive.  The concerns raised in *Fuyao Glass* and echoed in *Sichuan Changong* resonate in this case. Although Commerce need not perform "a formal investigation" whether prices are subsidized, there must be some positive evidence on the record to permit the court to evaluate whether Commerce's decision is supported by substantial evidence.  As the record currently stands, there is insufficient evidence to support Commerce's refusal to use the Thai and Korean price data. Therefore, under the *Fuyao Glass* and *Sichuan Changhong* precedent, the court orders Commerce on remand to reopen the record and make particularized findings in support of its decision to ignore the Thai and Korean price data (specifically referring to the three criteria from *Fuyao Glass*), or to reverse its decision not to use such price data and to recalculate the margin accordingly.

## III.    Commerce's Use of Non-Market Economy Methodology

Gold East argued at Commerce that it was a Chinese "MOE" ("market oriented enterprise"), and that the agency should therefore not have applied NME methodology to calculate Normal Value. Gold East's Request for MOE Treatment (Jan. 21, 2010) at 1-2, PR 107.  Gold East also submitted unsolicited information purporting to allow Commerce to apply ME Normal Value methodology. Market Oriented (MOE) Questionnaire Responses, PR 244; Gold East Case Brief at 80, PR 333.

---

[5]     Deft's Br. at 36.  *Sichuan Changhong* adopted the *Fuyao Glass* criteria, but did not discern whether Commerce used "mandatory" language.  This may be a case of a distinction without a difference.  In the *Fuyao Glass* remand results, Commerce ignored the difference between the terms. *See Final Results of Redetermination Pursuant to Court Remand*, ECF 122 in Ct. No. 02-00282, at 7. ("[Commerce] reiterates that, regardless of whether it has used 'are' or 'may be,' [Commerce's] focus has always been on whether there is a 'reason to believe or suspect' that prices for inputs from these countries may be subsidized. . . .")

Commerce rejected Gold East's positions. The agency stated in the I&D Memo:

> The antidumping statute and [Commerce's] regulations are silent with respect to the term "MOE."  Neither the statute nor the regulations compel the agency to treat some constituents of the NME industry as MOEs while treating others as NME entities.  To date, [Commerce] has not adopted any MOE exception to the application of the NME methodology in any proceeding involving an NME country.

I&D Memo at 30-31.  Plaintiffs claim that Commerce should have granted Gold East MOE treatment because it had earlier stated in the Federal Register that it might "grant an individual respondent in China market-economy treatment."  *See Antidumping Methodologies in Proceedings Involving Certain Non-Market Economies: Market-Oriented Enterprises*, 72 Fed. Reg. 60649, 60650 (Dept. of Commerce, Oct. 25, 2007).   The government counters that "Commerce considered APP-China's request to be considered for market-economy treatment, and determined that the 'available information' did not allow it to calculate normal value under market economy principles."  Deft's Br. at 23, *citing* I&D Memo at 5-10.

> Commerce followed its normal practice to determine whether APP-China's margin should be calculated using a market-economy methodology.  APP-China's argument rests on the bald assertion that Commerce should have created a new methodology even though it already has a reasonable methodology in place.  There is no reason to create this requirement.

Deft's Br. at 28.  The court agrees that APP-China's demand that Commerce treat it as an MOE or that it should have used ME methodology was premature, and Commerce's determination on this issue is reasonable.

### IV.    Targeted Dumping Issues

Commerce concluded that APP-China engaged in "targeted dumping", *i.e.*, that it sold its merchandise at export prices that differed significantly among purchasers.[6]  APP-China argues that Commerce incorrectly found targeted dumping, and unlawfully applied the targeted dumping remedy to all of its sales.

### a.    Withdrawn Targeted Dumping Regulation

APP-China's first argument is that Commerce failed to follow a portion of its targeted dumping regulation found at 19 C.F.R. § 351.414(f) (2007), which Commerce withdrew in 2008.  Pl's Br. at 27; *see also* Cmt. 3, I&D Memo at 21-24, *citing Withdrawal of Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 73 Fed. Reg. 74930 (Dec. 10, 2008) ("*Withdrawal Notice*").  The withdrawn regulation provided in part that where Commerce found targeted dumping, it would "normally" "limit the application of the average-to-transaction method to those sales that constitute targeted dumping". 19 C.F.R. § 351.414(f)(2) ("Limiting Rule").  APP-China argues that Commerce did not comply with Administrative Procedure Act's ("APA"), 5 U.S.C. § 500, *et seq*., notice and comment requirements in withdrawing the Limiting Rule, and the withdrawal was ineffective because it did not fall within the exceptions to the APA's notice and comment requirements.  Pl's Br. at 27.

Commerce argues that the withdrawal sufficiently complied with the APA

---

[6]      Under 19 U.S.C. § 1677f-1(d)(1)(B), Commerce may find "targeted dumping" where there is a pattern of export prices that differs significantly among purchasers, regions, or periods of time.  In those circumstances, Commerce may determine whether merchandise is being sold at LTFV by comparing weighted average to individual transaction prices, but only if Commerce explains why the differences cannot be accounted for by using an average-to-average or transaction-to-transaction method.

because two earlier notices had requested comments on related issues.  Deft's Br. at 48-9, *citing Targeted Dumping in Antidumping Investigations*, 72 Fed. Reg. 60651 (Oct. 25, 2007) ("*First Comment Request*"), and *Proposed Methodology for Identifying and Analyzing Targeted Dumping in Antidumping Investigations*, 73 Fed. Reg. 26371 (May 9, 2008) ("*Second Comment Request*").

The APA requires notice of proposed rulemaking (including withdrawal of regulations) to be published in the Federal Register and to include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). This notice must be "sufficiently descriptive to provide interested parties with a fair opportunity to comment and to participate in the rule making." *Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.2d 1098, 1104 (4th Cir. 1985) (citations omitted).   The APA provides that prior publication of notice and comment shall not be required:

> when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

5 U.S.C. § 553(b)(B).   The good cause exception is to "be narrowly construed and only reluctantly countenanced." *New Jersey v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980).

The *Withdrawal Notice* and the two *Comment Requests* curiously do not make reference to each other even though they were all issued within a single year on related topics. The two *Comment Requests* discuss the methodologies that Commerce will use to determine whether targeted dumping has occurred, while the Limiting Rule restricts Commerce's ability to impose the targeting remedy across all sales.  Therefore, the court finds that the *First* and *Second Comment Requests* failed to provide interested parties with the adequate notice and comment

before Commerce withdrew the Limiting Rule.

Although Commerce gave no notice before it withdrew the Limiting Rule, Commerce argues that the *Withdrawal Notice* should be deemed adequate under the APA because it provided for post-publication comments.  Deft's Br. at 51.  However, the APA requires otherwise.  Section 553 provides "that notice and an opportunity for comment are to precede rulemaking."  *See Air Transport Ass'n of America v. Dept. of Transp.*, 900 F. 2d 369 (D.C. Cir. 1990) *remanded*, 498 U.S. 1077, 111 S.Ct. 944, 112 L.Ed.2d 1033 (1991), *vacated as moot*, 933 F.2d 1043 (D.C.Cir. 1991) (rejecting FAA's contention that its response to comments after promulgation of rule cured any noncompliance with section 553).

The government cites *Federal Express Corp. v. Mineta*, 373 F.3d 112 (D.C. Cir. 2004), where the agency issued four rules seriatim over the course of less than a year, but only requested comments after each rule was issued.  That case does not support Commerce's actions here.  In *Federal Express*, there was an urgency to the rules, which affected airlines' compensation for losses suffered as a consequence of the shutdown of U.S. airspace following the attacks of September 11, 2001.  The affected parties commented on each version of the rules.  Furthermore, "the agency [] made a 'compelling showing,' that it provided 'a meaningful opportunity to comment' before the Fourth Final Rule became effective".  *Federal Express*, 373 F.3d at 120.  In this case, there was no urgency to Commerce's withdrawal of the Limiting Rule, and Commerce did not make any further statements regarding the Limiting Rule in response to any comments it received from the *Withdrawal Notice*.

Commerce argued in the *Withdrawal Notice* that the withdrawal did not require notice and comment under the "good cause" exception.  In the *Withdrawal Notice*, Commerce

cites three "good cause" reasons to ignore the APA notice and comment requirements in withdrawing the Limiting Rule.

> These provisions were intended to clarify when [Commerce] would use the average-to-transaction comparison method in antidumping duty investigations. As the provisions were promulgated without the benefit of any experience on the issue of targeted dumping, [Commerce] may have established thresholds or other criteria that have prevented the use of this comparison methodology to unmask dumping. . . . Given the above, sections 19 CFR 351.414(f), (g), and 351.301(d)(5) would act to deny relief to domestic industries suffering material injury from unfairly traded imports.  This effect is contrary to [Commerce's] intention in promulgating the provisions, and inconsistent with [Commerce's] statutory mandate to provide relief to domestic industries materially injured by unfairly traded imports. Because the provisions are applicable to ongoing antidumping investigations, and because the application of the provisions can act to deny relief to domestic industries suffering material injury from unfairly traded imports, immediate revocation is necessary to ensure the proper and efficient operation of the antidumping law and to provide the relief intended by Congress.

*Withdrawal Notice*, 73 Fed. Reg. at 74931.  The *Withdrawal Notice* claims that notice and comment was not required because it was "contrary to the public interest."[7]  Citing *National Customs Brokers and Forwarders Assn. of America v. United States*, 59 F.3d 1219 (Fed. Cir. 1995) ("*NCBFAA*"), the government argues that Commerce was justified in the immediate withdrawal of the Limiting Rule.  "Immediate withdrawal of the regulation was . . . necessary to allow domestic industries to take advantage of their statutory remedies." Deft's Br. at 56. However, in *NCBFAA* Congress changed the law and Customs acted expeditiously to implement the new requirements via an interim regulation.  In this case, Commerce withdrew the Limiting Rule with immediate effect, in order to "implement" a statute that had been in place for 14 years.

---

[7]      Deft's Br. at 58.  In its brief, Commerce abandons the claimed ground of impracticability cited by the Withdrawal Notice in support of the immediate withdrawal of the Limiting Rule. Deft's Br. at 58, n.9.

*Cf. Levesque v. Block*, 723 F.2d 175, 185 (1st Cir. 1983) (generalized interest in fiscal savings or other efficiencies insufficient support for public interest exception).

The court finds that none of Commerce's reasons in support of immediate revocation (without prior notice and comment) rise to the level required.  That Commerce improvidently enacted rules without adequate experience of how they would work, that the rules apply to ongoing investigations, and the rules could deny relief to domestic industries, do not rise to the level required for it to avoid the APA's requirements.  Indeed, those justifications could apply to *almost any* rule promulgated by the agency.

This situation is closely analogous to that found in *Citibank, Federal Sav. Bank v. FDIC*, 836 F.Supp. 3 (D.C. D.C. 1993), where the FDIC withdrew without providing notice or comment a rule regarding disposition of reserves held by FDIC on behalf of member banks. Several years later, Citibank sued to have the rule enforced, and the court agreed.

> Notice which fails to alert the public to significant policy changes violates the APA's notice and comment provisions. *See Natural Resources Defense Council, Inc. v. Hodel*, 618 F.Supp. 848 (E.D. Cal. 1985). Therefore, this court holds that because the FDIC did not comply with the relevant provisions of the APA when it purported to repeal 12 C.F.R. § 385.8(b), the repeal of that regulation was invalid. Consequently, 12 C.F.R. § 385.8(b) was still in force at the time of the merger of Citibank-Ill and Citibank-D.C. into Citibank-Cal.

*Citibank*, 836 F.Supp. at 7.   Because Commerce failed to provide notice and comment before withdrawing the Limiting Rule, and the agency failed to provide adequate cause to qualify under the exceptions to the notice and comment requirements, the court finds that the repeal of the regulation was invalid, and the Limiting Rule is still in force.  Commerce's decision to apply the targeted dumping remedy to all of APP-China's sales failed to comply with applicable law.

Commerce must, on remand, reconsider its application of the targeted dumping remedy under the Limiting Rule.  Assuming the finding of targeted dumping remains positive after reconsideration of the other issues addressed in this opinion, Commerce must limit application of the targeted dumping remedy to the targeted sales, or provide an adequate explanation why the situation is not a "normal" one before applying the remedy to all APP-China sales.

### b.  Targeted Dumping Testing

APP-China argues that Commerce's test for targeted dumping was unsupported by substantial evidence.  "Commerce created a test so complex that Commerce itself failed to apply its own test correctly."  Pl's Br. at 40.  APP-China alleges that Commerce incorrectly applied the test derived from the decision in *Mid Continental Nail Corp. v. United States*, 712 F.Supp. 2d 1370, 1377-78 (CIT 2010) ("*Nails* test").  In the first part of the *Nails* test, Commerce analyzed averages of prices, rather than individual prices, and calculated an average price and a standard deviation based on customer specific average prices.

APP-China argues that this violates 19 U.S.C. § 1677f-1(d)(1)(B)(i), because the statute distinguishes between "export prices" and "weighted average export prices", and Commerce used an average where the statute references only "export prices".  *See e.g.*, 19 U.S.C. § 1677a(a).  Commerce should be required to analyze targeted dumping using individual transaction prices rather than averages.  Pl's Br. at 41.  APP-China alleges that "the prices to the alleged target did *not* pass the first part of the [Commerce] test when using actual prices rather than constructed averages."  *Id*. at 42 (emphasis in original).

Commerce responds that it applied the *Nails* methodology accurately by using weighted average prices.  Deft's Br. at 69.  In the *Second Comment Request*, Commerce explained the *Nails* test.  In the first step of the test, "[t]he calculation of the standard deviation value would be done product by product . . . using period of investigation[]-wide average prices (weighted by sales value) for each allegedly targeted customer and each distinct non-targeted customer." *Second Comment Request*, 73 Fed. Reg. at 26372.

The court agrees that Commerce correctly applied this portion of the *Nails* test, as described in the *Second Comment Request*.  The statute does not require otherwise, despite plaintiffs' statutory construction arguments.  Therefore, the court upholds this portion of Commerce's determination as within its discretion in interpreting the statue involved.

### c.  Programming Errors

Under the second part of the *Nails* test, Commerce found "significant" price discrepancies whenever a non-targeted customer had higher-than-average prices.  APP-China argues that Commerce's computer code did not correctly compare the average price to the next-higher average price to a non-targeted customer as required by the *Nails* test.  Pl's Br. at 45, *citing* I&D Memo at 22.  Instead, the program searched for the lowest weighted average price to a non-targeted customer with a larger than average price gap.  Because Commerce actually never compared the alleged targeted price to the "next higher" price, as it was supposed to, APP-China argues that Commerce incorrectly identified targeted dumping in 8 of 8 examples used to justify the targeted dumping finding.  Pl's Br. at 46.

APP-China next alleges that Commerce failed to determine the average price gap for the entire group of non-targeted customers.  Pl's Br. at 47-8.  This is a critical part of

determining whether the targeted price gap represented an aberration.   Instead, Commerce determined the average price gap for only customers with higher average prices.   This approach increased the size of the price gap significantly and switched the result of the test from negative to positive.   *Id*.   According to APP-China, Commerce also ignored data from non-targeted customers with average prices below the price to the alleged targeted customer.   Pl's Br. at 49. Commerce used data from all the non-targeted customers during the first step in its targeting analysis – the "pattern" test.   But Commerce excluded lower-priced non-targeted customers in analyzing whether the prices differed significantly.   Finally, APP-China argues that Commerce used methodologies derived from a small sample, and then applied the results to the entire data set.   Commerce used data relating to shipments of only 1,005 metric tons (out of 53,809 MT total shipped).   Pl's Br. at 50, citing its Complete Output exhibit.

> Commerce thus impermissibly stacked the deck.   For those CONNUMs that passed its 'pattern' test, it then looked for <u>any</u> instance in which the non-targeted customer had an average price <u>higher</u> enough above the average price to the alleged targeted customer to be larger than the <u>smaller</u> price gap calculated for a subset of those non-targeted customers.   Commerce has not provided any justification for a test so distorted and so designed to achieve the desired outcome – finding some isolated examples of transactions that pass the tests.

Pl's Br. at 51 (emphasis in original, citation omitted).

Appleton argues that the program contains another error "that artificially enhanced the 'gap' between targeted and non-targeted prices so as to make targeting more difficult to find."   Appleton Supplemental Brief, ECF Doc. 80 at 6.

Commerce requests a voluntary remand to "examine the calculation program, and if appropriate, to correct the alleged errors and reconsider the finding that export prices differed significantly among purchasers."   Deft's Br. at 75.

The court agrees with the parties and remands to Commerce with instructions to review each of the computer programming issues identified above, to recalculate the margins after correcting any errors found, or to explain why it believes the errors do not exist.  *See SKF USA, Inc. v. United States*, 254 Fed.3d 1022, 1027-31 (Fed. Cir. 2001) (explaining circumstances where voluntary remand requests will be granted).

## V.      **Double-Counted Rebate**

APP-China argues that Commerce erred in double-counting a rebate in the calculation of its net U.S. price.  Plaintiffs contend that its revised U.S. sales database included data for the "Program for Growth" rebate twice.   Commerce responds that APP-China's submissions did not adequately demonstrate that APP-China was entitled to the adjustment. Deft's Br. at 85.   Appleton argues that APP-China based its "double-count" claim on tardy information which was unreliable.  Appleton's Resp. Br. at 55-56.

APP-China presented rebate information in two documents, one of which was an untranslated document which Commerce could not read.  Deft's Br. at 86.  Commerce denied the requested adjustment because it could not determine how the rebate amount was calculated.  The court agrees with Commerce that administrative exhaustion principles apply in this instance. *Gerber Food (Yunnan) Co. v. United States*, 601 F.Supp. 2d 1370, 1379 (CIT 2009).  APP-China could have submitted the information to Commerce in a more timely, accurate and legible manner.   The court finds that APP-China failed to meet its burden to show that it was entitled to an adjustment before Commerce, and this aspect of Commerce's decision is supported by substantial evidence.

## VI.    Export Price vs. Constructed Export Price Analysis

APP-China classified its sales as export price ("EP") transactions, which Commerce accepted. 19 U.S.C. § 1677a(a). According to Appleton, because some of the goods were delivered in the U.S. on a DDP (delivered duty-paid) or DDU (delivered duty-unpaid) basis, the sales should have been found to have been made in the U.S. Appleton Br. at 5, 13. If the sales were made in the U.S., they should have been classified as Constructed Export Price ("CEP") transactions and downward adjustments to the CEP prices made under 19 U.S.C. § 1677a(d). 19 U.S.C. § 1677a(b). In response to these arguments, Commerce held that:

> the record evidence supports continuing to treat the sales at issue as EP transactions. Specifically, for these sales, APP-China (GEHK) [Gold East's Hong Kong affiliate ("GEHK")] is identified as the seller of the merchandise and invoiced the U.S. customer prior to the date of importation. GPS [APP-China's U.S. importing affiliate] did not take title to the products, nor is it identified as the seller of the merchandise on the commercial invoice. [Footnote noting GPS's limited role omitted.]

> Accordingly, record evidence indicates that [GEHK] is the seller of the subject merchandise in these transactions, and that the sale took place outside the United States, before the date of importation, when [GEHK] invoiced the U.S. customer.[8]

The government defends Commerce's decision by arguing that the date of the invoice (which establishes the price and quantity) is critical under the terms of the statute and its regulations, especially where that date is prior to the date of importation. Deft's Br. at 89, *citing* 19 C.F.R. § 351.401(i). But an invoice date prior to import may indicate *either* an EP or CEP sale for purposes of 19 U.S.C. § 1677a, because both EP and CEP sales can be made prior to importation.

---

[8]    I&D Memo at 35 (footnotes omitted). GEHK is described as "an offshore trading company that [Gold East] uses as an invoicing party for its export sales." Pub. Gold East Section A Response (Dec. 23, 2009), PR 77 at 17.

The parties argue that the decisions in *AK Steel*, *Corus Staal* and *Nucor* should settle the issue of whether the sale of the goods was made inside or outside the U.S.  But while those decisions are instructive, the factors driving each of those cases differ from this case.  In *AK Steel Corp. v. United States*, 226 F.3d 1361 (Fed. Cir. 2000), our appellate court stated that:

> [t]he question at the root of this appeal is whether a sale to a U.S. purchaser can be properly classified as a sale by the producer/exporter, and thus an EP sale, even if the sales contract is between the U.S. purchaser and a U.S. affiliate of the producer/exporter and is executed in the United States.  Appellees argue that it can, if the role of the U.S. affiliate is sufficiently minor that the sale passes the PQ Test. The domestic producers argue that the plain language of the statute prevents such a classification. We agree with the domestic producers.

*AK Steel*, 226 F.3d at 1368.  However, the holding in *A.K. Steel* that the first unaffiliated sale is a CEP sale when it is made by an exporter's U.S. affiliate does not resolve the issue here.  Unlike in *AK Steel*, Commerce decided that GPS, the U.S. importer, did not make the sales in question. I&D Memo at 35.   Rather, Commerce found the sales were made by GEHK, Gold East's affiliate.

In *Corus Staal BV v. United States*, 502 F.3d 1370 (Fed. Cir. 2007), the exporter argued the sales were EP because they were made prior to importation, but Commerce found they were CEP sales made after importation because the orders were filled from U.S. stock. *Corus Staal*, 502 F.3d at 1376.  The case turned on whether the sale predated importation and the court agreed with Commerce that it did not.   *Corus Staal*, 502 F.3d at 1377.   *Corus Staal*'s holding was controlled by the statute because if the sale was made after importation then it could not be an EP sale.  19 U.S.C. § 1677a(a) (EP sales are made "before the date of importation"). *Corus Staal*'s holding as a result does not resolve the issues in this case.

*Nucor Corp. v. United States*, 612 F.Supp. 2d 1264, 1275 (CIT 2009), upheld

Commerce's finding of an offshore sale where title transferred to the U.S. buyers overseas, among other factors.  Commerce disagreed with an allegation that title transferred in the U.S.  *Id*. "[T]he sales agreement was signed in Turkey by [exporter] personnel, the invoice was issued by an entity in Turkey (*i.e.*, the producer/exporter) to an entity in the United States (*i.e.*, the U.S. customer), and it was concluded outside the United States." *Id.*, *quoting* Decision Memo at 66-67.  The court agreed with Commerce that the sales should be classified as EP because they occurred outside the U.S.  *Id*. at 1282-83.  Unfortunately, as with *Corus Staal*, the structure of the transactions in *Nucor* differed significantly from those in this case.

Moreover, the record evidence provides only a limited indication where the sale occurred under the statute and caselaw.  Commerce cited the following facts in its determination:

- GEHK invoiced the unaffiliated U.S. customer prior to importation;

- GEHK was the seller of the subject merchandise;

- GPS never took title to the merchandise;

- GPS was not identified as the seller on the commercial invoice;

- Delivery terms were DDU or DDP in the U.S.;

- The date of sale was the GEHK invoice date, since that invoice set "the material terms of sale".

I&D Memo at 35.  The record reveals that in these transactions, payment was made by overseas customers directly to GEHK or the U.S. affiliate GPS (which forwarded payment to GEHK). *See* Attachment 1 to Appleton Reply Br. (sales flow charts).  It appears that GEHK was not the producer or exporter of the merchandise, which shipped directly from Gold East to customers in

the U.S.  *Id.*  GEHK also purchased raw materials which were sent directly to Gold East.  *Id.*

But there is no discussion of contract terms regarding passage of title or risk of loss, other than

the use by the parties of DDP and DDU terms.  *Cf. Nucor*, 612 F. Supp.2d at 1273-1275

(discussing factors relevant to determination of locus of sale).  Also absent from the record is a

discussion of where and by whom the negotiations for the sales were held.  There is no mention

of whether there was an overall sales agreement covering the sales in question, and if so, where it

was made.  Commerce does not discuss the importance of the fact that payments went from the

U.S. customers to GEHK.  While Commerce found that the sales were not made by GPS, that

does not necessarily mean that the sales were not made in the U.S. due to other factors.

Even if the record fully supported Commerce's determination that the sales were

made outside the U.S., that factor is not dispositive of the EP/CEP classification, because the

statute also distinguishes between sales made by the producer and those made by another party

on behalf of the producer.  Under 19 U.S.C. § 1677a, an EP sale is the first sale (or agreement to

sell) "by the producer or exporter of the subject merchandise" outside the United States to an

unaffiliated purchaser in the U.S. 19 U.S.C. § 1677a(a).  A CEP sale is the first sale (or

agreement to sell) in the U.S. "by or for the account of the producer or exporter . . . *or by a seller

affiliated with the producer or exporter*" to an unaffiliated purchaser in the U.S.  19 U.S.C.

§ 1677a(b) (emphasis added).  In this case, the first sale was made by an affiliated seller (GEHK)

which was not the producer/exporter.[9]  Under the statute, if GEHK was the seller but not the

producer or exporter of the merchandise in question, the sale cannot be an EP sale.  By the same

---

[9]      *Id.* There is no indication in the record that Commerce decided to collapse the various
affiliates of Gold East, including GEHK, for purposes of the EP/CEP analysis. *Cf. AK Steel*, 226
F.3d at 1365 (Commerce analyzed collapsed companies).

token, however, if the sale was made outside the U.S., it cannot be a CEP sale.   19 U.S.C.

§ 1677a(b).

        This structural distinction is discussed in *AK Steel*.   There, the fact that the

affiliate was deemed the seller was critical to the court's conclusion that the sale could not be

deemed an EP sale.  As stated in *AK Steel*, "a sale made by a U.S. affiliate *or another party other*

*than the producer or exporter* cannot be an EP sale."  *AK Steel*, 226 F.3d at 1374 (emphasis

added).

> [T]he statute also distinguishes the categories based on the participation of an
> affiliate as the seller. The definition of CEP includes sales made by either the
> producer/exporter or "by a seller affiliated with the producer or exporter." 19
> U.S.C. § 1677a(b). EP sales, on the other hand can only be made by the producer
> or exporter of the merchandise. *See* 19 U.S.C. § 1677a(a). Consequently, while a
> sale made by a producer or exporter could be either EP or CEP, one made by a
> U.S. affiliate can only be CEP. Limiting affiliate sales to CEP flows logically
> from the geographical restriction of the EP definition, as a sale executed in the
> United States by a U.S. affiliate of the producer or exporter to a U.S. purchaser
> could not be a sale "outside the United States."  The location of the sale and the
> identity of the seller are critical to distinguishing between the two categories.

*AK Steel*, 226 F.3d at 1370-71.   The Statement of Administrative Action also distinguishes

between sales by the seller and sales for the account of the producer.   The latter are classified as

being CEP sales without reference to the location of the sale.  *Statement of Administrative Action*

*accompanying Uruguay Round Agreements Act (URAA)*, Pub. L. No. 103-465, tit. II, 108 Stat.

4809, H.R. Doc. No. 103-316 at 823 (1994) ("SAA").  It states,

> If, before or after the time of importation, the first sale to an unaffiliated person is
> made by (or for the account of) the producer or exporter or by a seller in the
> United States who is affiliated with the producer or exporter, then Commerce will
> base its calculation on constructed export price . . . .

*Id.* at 822-23.   The SAA thus classifies as CEP sales those made "for the account of" the

producer *or* those made by the producer's affiliate in the U.S.

The statute, through § 1677a(d), provides for downward adjustments in CEP prices to account for the presumed additional costs attributable to sales by affiliates, but the downward adjustment is not restricted to only U.S. affiliates.  Commerce's analysis failed to recognize the incongruity of classifying as EP sales that were made by the affiliate GEHK. Therefore, Commerce's finding that the sales were EP sales is not in accordance with law and is unsupported by substantial evidence on the record.

In addition, there is significant evidence on the record that conflicts with Commerce's finding that the sales were not made in the U.S, including the DDP and DDU nature of some transactions.  Coupled with the relative paucity of record information about several factors relevant to the finding of the location of the sale, and the limited discussion of this issue in the I&D Memo, the court finds that the determination that the sales were made outside the U.S. is unsupported by substantial evidence.  This issue is remanded to Commerce with instructions to reopen the question of whether the sales were EP or CEP.  Commerce shall review the record to determine if there is further evidence of where the sales were made. Commerce shall also provide a fuller analysis of why the sales should be deemed EP or CEP, including a discussion of how the fact that the sales were made by an affiliate should affect that determination.

## VII.    Surrogate Wage Rate Analysis

Appleton argues that Commerce used a flawed methodology to determine the surrogate wage rate for the People's Republic of China.  Appleton Br. at 6.  Commerce initially used a traditional regression methodology in the *Preliminary Determination*.  When that

methodology was overturned in *Dorbest v. United States*, 604 F.3d 1363, 1371 (Fed. Cir. 2010),

Commerce used a so-called "bookend" methodology for the *Final Determination*.

> [Commerce] used the highest- and lowest-income countries identified in the list of potential surrogate countries as 'bookends,' for purposes of determining the full list of economically comparable countries for calculation of the labor rate. Next, [Commerce] identified all countries that fell within the range of the 'bookends,' based on the World Bank's reported 2008 country-specific [Gross National Income "GNI"] per capita. This resulted in 43 countries, ranging from India with USD 1,040 GNI per capita to Peru with USD 3,990 GNI per capita.

I&D Memo, Comment 30 at 65, PR 353. Commerce found 23 countries with significant exports

of comparable merchandise between 2007 and 2009. *Id*. at 66. Commerce further refined the

list by identifying 15 countries with the necessary wage data. *Id*. at 67-68.

Commerce, according to Appleton, used "a broad average rate developed from

earnings for all workers in all industries in multiple countries whose only demonstrated

comparability to China was country-level per capita income." Appleton Br. at 14. Commerce

rejected Appleton's insistence that it use only data from an Indian paper company's financial

statements because "wage data from a single country does not constitute the best available

information for purposes of valuing the labor input due to the variability that exists between

wages and GNI." Cmt. 30, I&D Memo at 68. "[Commerce] has a longstanding and predictable

practice of selecting economically comparable countries on the basis of absolute GNI, and

nothing in Petitioners' submissions undermines the reasonableness of that practice." *Id*. at 65.

The bookends approach has subsequently been invalidated and been replaced with

one which looks to wages in the primary surrogate country. Appleton Reply at 10, *citing*

*Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the*

*Factor of Production: Labor*, 76 Fed. Reg. 36902, 36093 (Dep't Comm. June 21, 2011). The

government argues that the court should not impose the new primary surrogate methodology

because the *Antidumping Methodologies* announcement by its terms was not made retroactive.

Deft's Br. at 92, n. 16, *citing Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 815

F.Supp. 2d 1342, 1359-60 n. 23 (CIT 2012).

      The court agrees with the holding in *Grobest*, where the court upheld

Commerce's decision to use averaged data rather than specific data.

> In this case, Commerce had industry-specific data for one country, Bangladesh.
> With industry-specific data for only one country, Commerce was faced with
> making a choice between specificity and accounting for wage rate variance by
> averaging data from as many countries as possible. It chose the latter. A
> reasonable mind could determine that Commerce chose the best available
> information [citing *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d
> 1333, 1341 (Fed. Cir. 2011); and *Shandong Rongxin Imp. & Exp. Co. v. United
> States*, 774 F. Supp. 2d 1307, 1314 (CIT 2011)], and the court will not upset
> Commerce's reasonable choice.

*Grobest*, 815 F.Supp. 2d at 1360.  For similar reasons, the court declines Appleton's invitation to

overturn Commerce's reasonable decision to use the then-applicable "bookends" approach.  As

stated by the government, "Appleton's argument is nothing more than an invitation for the court

to substitute its judgment regarding the best surrogate data source for that of Commerce." Deft's

Br. at 94.

      Appleton also argues that Commerce erred in its selection of countries used in the

"bookends" approach because it did not choose countries bracketed equally around China's data.

But the countries selected had gross national incomes both above and below that of China, unlike

the situation in *Dorbest*, where the court remanded for reconsideration because Commerce

selected bookend countries that all had GNIs below that of China.  *Dorbest Ltd. v. United States*,

755 F.Supp. 2d 1291, 1298 (CIT 2011). The court has reviewed the record and finds that this

aspect of Commerce's decision was reasonable under the circumstances.

## CONCLUSION

Based upon the record developed before Commerce and upon the papers and proceedings before this court, for the reasons set forth above, the court remands this action to Commerce for action consistent with this opinion. Commerce shall prepare a preliminary analysis of the issues and submit it to the parties no later than 90 days from the date of this opinion. Within 30 days of the preliminary analysis, the parties shall be permitted to file comments with Commerce. Commerce shall then have another 60 days to complete a final redetermination which will be filed with the court no later than Monday, December 16, 2013. The parties shall have thirty days thereafter to file comments on the remand in this court.

**SO ORDERED.**


     /s/  R. Kenton Musgrave                      
          R.  Kenton Musgrave, Senior Judge

Dated: June 17, 2013
       New York, New York

We use cookies to enhance your experience on our website. By clicking 'continue' or by continuing to use our website, you are agreeing to our use of cookies. You
can change your cookie settings at any time.
Continue
Find out more

# Oxford English Dictionary | The definitive record of the English language

# meaningful, *adj.*

**Pronunciation:**  Brit. /ˈmiːnɪŋf(ʊ)l/ , U.S. /ˈminɪŋf(ə)l/

**Etymology:**  < MEANING *n.*² + -FUL *suffix*. Compare earlier MEANINGLESS *adj.*

### 1.

**a.** Full of meaning or expression, significant; communicating something that is not explicitly or directly expressed.

1852    *Tait's Edinb. Mag.* **19** 552   All the little meaningful gifts.

1879   G. MACDONALD *Sir Gibbie* xiii,   It was a..meaningful smile.

1920   D. H. LAWRENCE *Women in Love* xiv. 193   She paddled softly, lingeringly, longing for him to say something meaningful to her.

1932   W. FAULKNER *Light in August* viii. 179   She would at last make such a todo of meaningful whispers and signals that McEachern would have to suspect something despite himself.

1991   D. COUPLAND *Generation X* I. 5   'Date from hell,' she announced, causing Dag and I to exchange meaningful glances.

**b.** Having a serious, important, or recognizable quality or purpose.

1852    *Weekly (*Milwaukee*) Wisconsin* 30 June 3/5   So earnest her manner, so meaningful her words, that one seemed to feel the blessings showered upon one's head.

1873   *Harper's Mag.* Jan. 216/2   She had sometimes dreamed of something more meaningful and truer,..a life coming straighter from the heart.

1889   *Mod. Lang. Notes* **4** 144/1   Strike out the line, 'Which drizzled blood upon the Capitol', and count how much is lost... A fight of fierce fiery warriors, with groans of dying men, surely calls for mention of blood,–how meaningful in this case is 'drizzled'!

1922   *Times Educ. Suppl.* 29 Apr. 200/2   The pupils see at once that their studies are meaningful.

1973   *Times* 9 Feb. 24/4   Federation met again last month to try to get meaningful talks going again on a new disputes machinery.

1993   *Albuquerque (*New Mexico*) Jrnl.* 26 Oct. B3/4   A downwardly mobile professional, usually under 40, who breaks off a promising or successful career to pursue more meaningful and spiritual activities.

**2.** Of a word, sound, etc.: conveying meaning; (*Logic* and *Philos.*) compatible with the rules of a logical language or other sign system; able to function as a term in such a system.

1874  *Ladies' Repository* June 465/1  Seeming nonsense choruses..are in reality the remnants of the songs sung by the ancient Britons... Fal meaning a circle or sun, and la a day, and both words expressing the completion of a day. As the Druids marched round their stone circles..they chanted their meaningful chorus, 'Fal-la-fal-la'.

1933  L. BLOOMFIELD *Lang.* x. 166  In the case of lexical forms, we have defined the smallest meaningful units as morphemes.

1953  *Mind* **62** 8  We often ask what a word means, but we do not ordinarily ask whether a word is meaningful or not. If it were not meaningful we would not call it a word.

1973  *Physics Bull.* May 281/3  The phoneme is the smallest meaningful unit of sound a listener can perceive.

1992  *New Yorker* 13 Apr. 79/1  She had learned to separate meaningful sounds from the general cacophony surrounding her.

**3.** Of data or its presentation: accurate and realistic; of practical use.

1929  *Q. Jrnl. Econ.* **43** 293  It is the aim of this division..to establish a common basis so as to facilitate the exchange of information and make as meaningful as possible the regular reports as to employment, contracts, [etc.].

1942  *Jrnl. Amer. Statist. Assoc.* **37** 336  Health, child welfare, [etc.]..were carefully investigated in order to furnish the Council..[with] accurate and meaningful information.

1985  *Austral. Business* 4 Sept. 79/1  Calais sales are not separated from Commodore sales overall, so a meaningful figure on GM-H's performance in this market is not available.

1991  *Antiquity* **65** 808/1  Such assemblages of data provide the best opportunities for the construction of meaningful chronologies, since they contain both archaeological and radiocarbon information of a high quality.

## SPECIAL USES

**meaningful dialogue**  *n.* a free and open debate between two parties (as states, political factions, etc.), esp. with opposed interests or with a history of conflict; any open and unbiased exchange of views.

1965  *Jewish Educ.* **35** 177/1  There can be no fruitful or meaningful dialogue between the Bureau and the denominational groups so long as one of the participants questions the legitimacy of the other.

1969  *Amer. Q.* **21** 186  An effort to launch a meaningful dialogue whereby intelligent Americans could probe the bigotry that infested not merely the lower orders but the best society might have been a worthwhile project.

1990  *Independent on Sunday* 28 Jan. 20/6  Apart from this bit-part in the bogus theatre of free debate, there has been no meaningful dialogue.

**meaningful relationship**  *n.* any significant affiliation or friendship; a

romantic association based on a strong emotional or intellectual
attachment (esp. as opposed to a relationship based principally on sexual
attraction).

1944   *School Rev.* Feb. 92   Meaningful Relationships Between Home and School.

1957   *Amer. Sociol. Rev.* **22** 56   It is interesting to note a higher tolerance ratio at the next two levels of erotic intimacy... The probable explanation is greater emotional involvement of the girls in more meaningful relationships with corresponding exploitability.

1991   *Courier-Mail (*Brisbane*)* 26 Jan. 44/7 (*advt.*)   Quiet female, 29, pretty, no children, never married, looking for a meaningful relationship, more so a husband.

**Oxford University Press**
Copyright © 2013 Oxford University Press . All rights reserved.

Your access is brought to you by:
Admin. Office%2C US Courts