\                                   Slip Op. 14 - 79

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| GOLD EAST PAPER (JIANGSU) CO., LTD., NINGBO ZHONGHUA PAPER CO., LTD., and GLOBAL PAPER SOLUTIONS, | : | |
| | : | |
| | : | |
| | : | |
| Plaintiffs, | : | Before: R. Kenton Musgrave, Senior Judge |
| | : | |
| v. | : | Consol. Court No. 10-00371 |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| APPLETON COATED LLC, NEWPAGE CORP., S.D. WARREN COMPANY d/b/a SAPPI FINE PAPER NORTH AMERICA, and UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC, | : | |
| | : | |
| Defendant-Intervenors. | : | |

## OPINION AND ORDER

[Remanding administrative redetermination on investigation of sales at less than fair value of certain coated paper from the People's Republic of China.]

Dated: July  2, 2014

*Daniel L. Porter* and *Ross E. Bidlingmaier*, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington DC, for the plaintiffs.

*Alexander V. Sverdlov*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington DC, for defendant.  With him on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*,

Assistant Director.  Of Counsel on the brief was *Mykhaylo A. Gryzlov*, Senior Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

*Terence P. Stewart* and *William A. Fennell*, Stewart and Stewart, of Washington, DC, and *Gilbert B. Kaplan*, *Christopher T. Cloutier*, and *Daniel L. Schneiderman*, King & Spalding, LLP, of Washington DC, for the defendant-intervenors.

Musgrave, Senior Judge:   This opinion addresses the *Final Results of Redetermination Pursuant to Court Remand* ("*Redetermination*") that concern the antidumping duty investigation on *Certain Coated Paper from the PRC* ("*Final Determination*").[1]  Familiarity with the prior opinion on the case, 38 CIT ___, 918 F. Supp. 2d 1317 (2013), is here presumed.

Pursuant to the order of remand, the International Trade Administration, U.S. Department of Commerce ("Commerce") undertook to (1) calculate the value of certain inputs using only market economy purchase prices, (2) use the purchase prices from South Korea and Thailand for the inputs therefrom, (3) correct certain programming errors in the targeted dumping calculation, (4) reconsider the classification of certain sales of the Gold East Companies[2] as export price sales, resulting in no change of that classification, and (5) employ average-to-average comparison methodology in the targeted dumping analysis after finding that, as a result of the revisions with respect to the remanded issues, that method adequately accounted for pricing differences.

---

[1]  *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China*, 75 Fed. Reg. 59217 (Sept. 27, 2010), Public Record Document ("PDoc") 360, as amended by *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Amended Final Determination of Sales at Less than Fair Value and Antidumping Order*, 75 Fed. Reg. 70203 (Nov. 17, 2010), PDoc 369.

[2]  Gold East Paper (Jiangsu) Co., Ltd., Gold Huasheng Paper Co., Ltd., Gold East (Hong Kong) Trading Co., Ltd., Ningbo Zhonghua Paper Co., Ltd., and Ningbo Asia Pulp and Paper Co., Ltd. (collectively, "Gold East Companies" or "APP-China").

Commerce contends the *Redetermination* complies with the remand order.  Two issues remain in dispute here, however.  The domestic industry petitioners[3] argue that Commerce's original determinations in the *Final Determination* of not treating the reported input prices from Thailand and South Korea as market economy purchases and of using average-to-transaction methodology as the targeting-dumping remedy for the Gold East Companies were proper and correct.  Responding, the plaintiffs argue the results of remand should be sustained as is.  Considering those results and comments thereon, the court concludes remand is again required.

*Discussion*

I.  Inputs from South Korea and Thailand

The issue concerning the claimed market economy purchase ("MEP") prices for the inputs from Thailand and South Korea was previously remanded because the record provided insufficient support for believing or suspecting the prices in question had been distorted by subsidies.  *See* 38 CIT at ___, 918 F. Supp. 2d at 1324; *see also* 19 U.S.C. §1677b(c)(1) (2006); 19 C.F.R. §351.408(c)(1) (2008).  Commerce disagrees with the order either to reopen the record and make particularized findings to support the conclusion of distorted input prices or to reverse the decision not to use the input price data and concomitant recalculation of the margin.  It opted for the latter under protest.  *Redetermination* at 16.

Having reversed its prior decision, Commerce reiterates that if a country maintains broadly available, non-industry specific export subsidies, its practice has been to find the existence

---

[3] *I.e.,* Defendant-intervenors Appleton Coated LLC, NewPage Corporation, S.D. Warren Company d/b/a/ Sappi Fine Paper North America, and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC.

of such subsidies a sufficient reason to exclude the affected input from the factors of production

values.  Its stated position on not reopening the record is based on its inference of "the existence"

of such subsidies, from which it presumes the relevant inputs to have benefitted, and it maintains it

is "longstanding practice to not obtain further evidence or conduct a formal investigation to

determine whether such prices are subsidized, but instead to base [the] decision only on information

available to it at the time it makes its determination." *Id.* (bracketing added), referencing *inter alia*

*Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination*

*of Critical Circumstances: Certain Color Television Receivers From the People's Republic of China*,

69 Fed. Reg. 20594 (Apr. 16, 2004), and accompanying I&D Memo ("*CCTR*") at comment 7.

The petitioners requested during remand that Commerce reopen the administrative

record.  Petitioners' Letter to the Department of Commerce dated July 26, 2013, Remand Public

Document ("RPDoc") 1.  Commerce declined.  Commenting on the draft remand results, the

petitioners raised the substance of Memorandum from the Office of Policy to DAS and Office

Directors, "NME investigations: procedures for disregarding subsidized factor input prices" (Feb.

2002), which advised that all factor inputs from *inter alia* South Korea and Thailand should be

disregarded.  The petitioners pointed out that: (1) it has been Commerce's consistent position since

the memorandum's publication to infer that the prices of inputs purchased from those countries are

likely distorted; (2) Commerce has identified a number of subsidy programs that benefit exporters

from Thailand, including the Royal Thai Government's Tax Coupon Program ("TCP") and the

Investment Promotion Act ("IPA") ("in existence" they claim since 1977), as recently discussed in

Commerce's 2013 determination on warmwater shrimp from Thailand, covering a period of

investigation in 2011 that would have obviously post-dated the POI here[4]; (3) the TCP was specifically available for the type of input in question here, and the IPA identified producers of that input as a favored industry; and (4) the court has found that the agency's determination that a company supplying an NME producer was listed as approved for promotion by the Thai Board of Investment under the IPA constituted a showing "by specific and objective evidence" that there was "reason to believe or suspect" that the supplier received subsidies in *Fuyao Glass Indus. Group Co. v. United States*, 29 CIT 109, 117-18 (2005).[5] *See* Petitioners' Comments on Prelim. Remand at 6-7, Remand Confidential Document ("RCDoc") 10; RPDoc. 10.

      The petitioners further criticize the remand results as simply a recalculation of the margin using the MEP values on remand.  They argue that without any analysis of whether those values are the best available information leading to the calculation of the most accurate margin, Commerce has given the remand order an interpretation that renders it legally erroneous.  Petitioners' Comments at 9, referencing *Borlem S.A.- Empreedimentos Industriais v. United States*, 13 CIT 231, 234, 710 F. Supp. 797, 799 (1989) (when issuing remand orders courts must be "mindful of the doctrine of primary jurisdiction" whose "central purpose . . . is to permit courts to give effect to legislative intent underlying the established regulatory scheme by referring matters involving agency expertise back to the agency so that it may, in the first instance, pass upon the issue from its unique

---

   [4]  *I.e.*, January 1, 2009, through June 30, 2009.

   [5]  It will be recalled that the three-prong test of *Fuyao Glass* is whether (1) subsidies of the industry in question "existed" in the supplier countries during the period of investigation, (2) the supplier in question is a member of the subsidized industry or otherwise could have taken advantage of any available subsidies, and (3) it would have been unnatural for a supplier not to have taken advantage of such subsidies.  *Fuyao Glass*, 29 CIT at 114.

administrative perspective").[6]  More precisely, they contend that the record to date is devoid as to

any information that would indicate the South Korean or Thai companies that supplied the Gold East

Companies with inputs were not subsidized, that Commerce has not determined that the pricing data

from these countries is the best available, that *Fuyao Glass* rejected this same approach, 30 CIT 165,

168-69 (2006), and that Commerce's attempt to distinguish *Fuyao Glass* on the basis that it ordered

Commerce to "concur" or reopen the record, in contrast to the remand order in this case to "reverse"

or reopen the record, does not render *Fuyao Glass*'s finding of inadequate explanation inapplicable.

*Id*. at 8-9.

On the argument that the record is devoid as to information that the inputs were not

subsidized, the contention assumes the validity of Commerce's presumption that they were.  On that

aspect, the plaintiffs argue that the question as addressed by the court is that the record lacked

positive evidence of subsidization.  That characterization is not entirely accurate, however.  Based

on the standard pursuant to which Congress directed Commerce to operate, the question to be

answered was whether there was positive evidence on the record for "the belief or suspicion of"

subsidization relevant to the POI, a standard that requires sufficient (*i.e.*, substantial) evidence on

the record to give rise, *prima facie*, to that presumption.

On the argument that Commerce did not determine that the claimed MEP values

represented the best information available, the argument has some merit,[7] but on the more precise

---

[6]  The petitioners' implicit characterization of the prior opinion is magnanimous.

[7]  Commerce "has an obligation to review all data and then determine what constitutes the best information available or, alternatively, to explain why a particular data set is not methodologically reliable."  *Olympia Industrial, Inc. v. United States*, 22 CIT 387, 390, 7 F. Supp.

(continued...)

argument that the agency's interpretation of the remand order renders the order legally erroneous, the court does not fault an administrative attempt to follow a remand order's literal terms unless the intention thereby would be to produce a reversible result.  *Cf. Redetermination* at 16 ("The Department does not believe that in this case the [c]ourt requires the agency to concur with its decision and thereby possibly undermine its options with respect to any potential appeal."), citing *Viraj Group, Ltd. v. United States*, 343 F.3d 1371 (Fed. Cir. 2003), & *cf.* 343 F.3d at 1376 (technicality of prevailing-party status would not preclude appeal by Commerce when it "adopted under protest a contrary position forced upon it by the court").   Commerce may have merely followed orders out along an arguable reach, but however that may be, remand results provided "under protest" are unhelpful to interested readership whenever the explanation on remand merely amounts to repetition of the agency's original position.  Feedback, via remand results and comments thereon detailing any perceived deficiency in an opinion or concerning the overlying order itself, aids in reaching the correct result.

The petitioners' other implied points are well-taken.   Regarding their subtle argument that the *Redetermination*'s resistance to "reopening" the administrative record is an implicit contest over the legality of the prior order, it is true, as Commerce implies, that where an interested party bears the burden of creating an accurate record with respect to a particular fact,

---

[7] (...continued)
2d 997, 1001 (1998).  The "overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible".  *Parkdale International v. United States*, 475 F.3d 1375, 1380 (Fed. Cir. 2007), citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir.1990).  The appellate court has also stated that "there is much in the statute that supports the notion that it is Commerce's duty to determine margins as accurately as possible, and to use the best information available to it in doing so."  *McLeod v. Immigration and Naturalization Service*, 802 F.2d 89, 93 n.4 (3d Cir. 1986)

courts should "declin[e] to require reopening of the record, except in the most extraordinary circumstances." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 296 (1974). *See*, *e.g.*, *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1277-78 (Fed. Cir. 2012) ("[t]he decision to reopen the record is best left to the agency"). That is deferentially appropriate. But while interested parties bear the burden of proffering information to support their case, the burden is on Commerce, not interested parties, to include in the record the *prima facie* "information available to it at the time" that it claims as providing the reasonable basis to believe or suspect the existence of distorted input prices.[8]  *See* H.R. Conf. Rep. No. 100-576 (1988) at 590-91, *reprinted in* 1988 U.S.C.C.A.N. 1547, 1623-24 ("the conferees do not intend for Commerce to conduct a formal investigation to ensure that such prices are not dumped or subsidized, but rather intend that Commerce base its decision on information *generally available* to it at that time") (italics added); *see also Sichuan Changhong Electric Co., Ltd. v. United States*, 30 CIT 1481, 1494-96 & n.16, 460 F. Supp. 2d 1338, 1350-52 & n.16 (2006) (Commerce bears burden of providing specific and objective evidence for the record to support a belief or suspicion of distorted MEPs); *cf. Essar Steel*, 678 F.3d at 1277-78, referencing *Borlem S.A.-Empreedimentos Industriais v. United States*, 913 F.2d 933, 937 (Fed. Cir. 1990) (upholding court order that International Trade Commission consider extra-record evidence on remand in antidumping injury investigation); *cf. also Borlem*, 913 F.2d at

---

[8]  For the sake of further clarity, here noted is that to the extent APP-China argued the onus should be on Commerce to place on the record evidentiary information that shows the relevant inputs to be "indisputably" distorted, such an argument overstates the *prima facie* "substantial evidence" case that would give rise to a valid presumption, and incorrectly disregards the shift in the burden of proof resulting therefrom.

940 (directive to reconsider in light of intervening factual correction "is no different from a reversal and remand for reconsideration because a fact relied on is unsupported by the evidence").

Necessarily, judicial remand in its own right "will compel the agency to reopen or reconsider its decision", Charles H. Koch, Jr. and Richard Murphy, 2 *Admin. L. & Prac.* § 5:71 (3d ed.), and as previously discussed, the administrative record was not found to provide sufficient support for the determination reached.[9]  The intention of the order of remand was only, if not more, to point out that reopening the record was one of two apparent consequences of a record that lacked the substantial evidence necessary to support the legal viability of the presumed fact of input price distortion.  But given Commerce's position on (not) reopening the record on remand, as expressed in the *Redetermination*, at this point the court must consider whether the language of the remand order may have inadvertently engendered misinterpretation.

*CCTR*, *supra*, is referenced in the *Redetermination* as support for the proposition of not opening the record.  That determination does not facially explain why inclusion in the record of the substantial, specific, and objective "information available to it at the time" that is necessary to show "the existence" during the POI of relevant "broadly available, non-industry specific export subsidies" from which input price distortion could properly be presumed is precluded.[10]  *CCTR*

---

[9]  *See* 38 CIT at ___, 918 F. Supp. 2d at 1324 ("[a]s the record currently stands, there is insufficient evidence to support Commerce's refusal to use the Thai and Korean price data", *i.e.*, to presume those data distorted).

[10]  Specifically in the event Commerce construed the order of remand as requiring some type of "formal" inquiry as opposed to simply requiring placement on the record of the "substantial, specific, and objective eviden[tiary]" support, *see China National Machinery Import & Export Corp. v. United States*,  27 CIT 255, 267, 264 F. Supp. 2d 1229, 1240 (2003), of "information available to it at the time," for finding that South Korea and Thailand maintained broadly available, non-industry
(continued...)

rather appears only to reiterate Commerce's general policy of excluding inputs from, *inter alia*, South Korea and Thailand "because of *known*, generally available, non-industry specific export programs in those countries" as stated in Commerce's 2002 memorandum on the subject. *CCTR* at comment 7 (italics added). But here, at least insofar as the court can discern, there is nothing

---

[10] (...continued)
specific export subsidies during the POI, which is the necessary precursor for justifying the belief or suspicion that MEPs for inputs purchased from those counties are distorted, the court will here again dispel that notion: as implied in the prior opinion, the court as a whole has years of awareness that Congress, in directing that Commerce may rely on a "belief or suspicion" of input price distortion to justify disregard of distorted input prices in its factors of production analysis, indicated that a "formal" investigation into the distortion problem is unnecessary -- not to mention impractical, given the time constraints of these administrative proceedings. *See* H.R. Conf. Rep. No. 100-576 (1988) at 590-91, *reprinted in* 1988 U.S.C.C.A.N. 1547, 1623-24; *see, e.g., Shenzhen Xinboda Industrial Co. v. United States*, 38 CIT ___, ___, 976 F. Supp. 2d 1333, 1373-74 (2014); *Clearon Corp. v. United States*, 35 CIT ___, ___, 800 F. Supp. 2d 1355, 1358 (2011); *Jinan Yipin Corp. v. United States*, 35 CIT ___, ___, 774 F. Supp. 2d 1238, 1244 (2011); *Zhejiang Machinery Import & Export v. United States*, 31 CIT 159, 163-64, 473 F. Supp. 2d 1365, 1370 (2007); *Shandong Huarong Machinery Co. v. United States*, 31 CIT 30, 37 (2007); *Sichuan Changhong Electric, supra*, 30 CIT at 1493-94, 460 F. Supp. 2d at 1350; *Goldlink Industries Co. v. United States*, 30 CIT 616, 628, 431 F. Supp. 2d 1323, 1334 (2006); *Fuyao Glass, supra*, 30 CIT at 169; *Hangzhou Spring Washer Co. v. United States*, 29 CIT 657, 668-69, 387 F. Supp. 2d 1236, 1247 (2005); *Shandong Huarong Machinery Co. v. United States*, 29 CIT 484, 494-95 (2005); *Fuyao Glass, supra*, 29 CIT at 111 n.3; *Luoyang Bearing Corp. v. United States*, 28 CIT 733, 738, 347 F. Supp. 2d 1326, 1334 (2004); *Crawfish Processors Alliance v. United States*, 28 CIT 646, 654, 343 F. Supp. 2d 1242, 1251 (2004), *rev'd on other grounds*, 477 F.3d 1375 (Fed. Cir. 2007); *Peer Bearing Co.-Changshan v. United States*, 27 CIT 1763, 1765, 298 F. Supp. 2d 1328, 1331 (2003); *China National Machinery Import & Export Corp. v. United States*, 27 CIT 1553, 1554, 293 F. Supp. 2d, 1334, 1335 (2003); *Yantai Oriental Juice Co. v. United States*, 27 CIT 477, 479 (2003); *Rhodia, Inc. v. United States*, 25 CIT 1278, 185 F. Supp. 2d 1343, 1352 (2001); *Baoding Yude Chemical Industry Co. v. United States*, 25 CIT 1118, 1124, 170 F. Supp. 2d 1335, 1342 (2001); *Taiyuan Heavy Machinery Import and Export Corp. v. United States*, 23 CIT 701, 708 (1999); *Coalition for Preservation of American Brake Drum and Rotor Aftermarket Manufacturers v. United States*, 23 CIT 88, 117 n.51, 44 F. Supp. 2d 229, 251 n.51 (1999); *Nation Ford Chemical Co. v. United States*, 21 CIT 1371,1374, 985 F. Supp. 133, 135 (1997); *Kerr-McGee Chemical Corp. v. United States*, 21 CIT 1353, 1366, 985 F. Supp. 1166, 1177 (1997); *but cf. Catfish Farmers of America v. United States*, 33 CIT 1258, 1276, 641 F. Supp. 2d 1362, 1380 (2009) (observing Commerce taking the position that the "mere mention" in a financial statement that a subsidy was received does not mean that a countervailable subsidy exists).

apparent, *e.g.*, a vested right, that would estop or preclude supplementation of the record with that

level of substantial, specific, and objective "information available to [Commerce] at the time" that

would be necessary to satisfy the judicial standard of review. For that matter, Commerce has, in fact,

"reopened" the record. *See infra*.

Mere "belief or suspicion" is a thin reed to support a determination of input price

distortion. Again: "in order for reasonable suspicion to exist[,] there must be 'a particularized and

objective basis for suspecting' the existence of certain proscribed behavior, taking into account the

totality of the circumstances, the whole picture." *China National Machinery*, *supra*, 27 CIT at 266,

264 F. Supp. 2d at 1239, quoting *Al Tech Specialty Steel Corp. v. United States*, 6 CIT 245, 247, 575

F. Supp. 1277, 1280 (1983), which discussed, *inter alia*, *Terry v. Ohio*, 392 U.S. 1 (1968).

Consequently, and in accordance with the substantial evidence standard of review, the first prong

of the *Fuyao Glass* test requires specific and objective evidence showing that "subsidies" (or

subsidization) of the industry in question in fact "existed". 29 CIT at 114. Detailed positive

evidence of that existence -- during the POI -- of broadly-available, non-industry specific subsidies

has been held to satisfy this prong, *see CS Wind Vietnam Co., Ltd. v. United States*, 38 CIT ___, ___,

971 F. Supp. 2d 1271, 1292 (2014), as well as the substantial evidence  standard of review, *see*

*Zhejiang Machinery, supra*, 31 CIT at 164-71, 473 F. Supp. 2d at 1370-76, but the "general policy"

concerning "broadly available, non-industry specific subsidies" as outlined in Commerce's 2002

memorandum regarding, *inter alia*, Thailand and South Korea has been held "not [to] provide the

court with the specific and objective evidence necessary for Commerce to meet its burden", because

that memorandum includes only "general findings" thereon and "does not explain the findings in any

way." *Sichuan Changhong Electric*, 30 CIT at 1494 n.16, 460 F. Supp. 2d at 1350 n.16.  This is so,

because the agency's stated practice cannot be interpreted to amount to a presumption of law: in

order to be held consistent with congressional intent to avoid using distorted factor prices,

Commerce's general policy must be, and it has been, construed as amounting to a presumption of

fact, *i.e.*, "[a] type of rebuttable presumption that may be, but as a matter of law need not be, drawn

from another established fact or group of facts".[11]

　　　　　In this matter, Commerce again proceeded down its familiar path to prove the validity

of the presumption, albeit in a rather cursory manner.  In the original *Final Determination*,

Commerce declared "the existence" of generally-available non-industry specific subsidy programs

during the period of investigation to be a fact.  *See* I&D Memo at comment 17.  But given the review

standard of substantial evidence (and precedent), the court could not accept such an *ex*-record appeal,

to generalized official notice[12] of knowledge of "the existence" of such subsidy programs, as

substantial evidence to justify presuming therefrom that the input prices in question were distorted.

---

[11]  *Black's Law Dictionary* 1377 (10th ed. 2014).  A presumption of fact's validity is dependent upon proof: the secondary fact that would give rise to the presumption must be "established" and must have probity to the particular proceeding as well as the presumed fact, *see, e.g.*, *United States v. Reyburn*, 31 U.S. 352 (1832), whereas a presumption of law "appl[ies] *in the teeth of the facts*, as means of implementing authorized law or policy".  *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 815 (1990) (Scalia, J., dissenting; emphasis in original). *Cf. Redetermination* at 16 ("[i]f a country maintains broadly available, non-industry specific export subsidies, our practice is to find the existence of such subsidies sufficient reason to exclude it from import data used to calculate FOP values").

[12]  Official notice is a method of "authoriz[ing] the finder of fact to waive proof of facts that cannot seriously be contested."  *Galina v. INS*, 213 F.3d 955, 958-59 (7th Cir. 2000) (citations omitted).  It is "a broader concept than judicial notice" in that "[b]oth doctrines allow adjudicators to take notice of commonly acknowledged facts, but official notice also allows an administrative agency to take notice of technical or scientific facts that are within the agency's area of expertise." *McLeod v. INS*, 802 F.2d 89, 93 n.4 (3d Cir. 1986).

Such an appeal falls short of being "somewhere between proof and simple recognition of a fact as so well accepted as to be beyond debate." *See* 2 *Admin. L. & Prac.* § 5:55. That continues to be the case (and law) at this point. *Cf. CS Wind Vietnam*, *supra*, 38 CIT at ___ n.14, 971 F. Supp. 2d at 1292 n.14 ("Commerce must either abide by the standard set out in *Fuyao Glass* or propose another reasonable means of evaluating whether it has sufficient evidence to support a belief or suspicion that the market economy inputs in the particular case at hand were subsidized").

      Commerce also maintains, in the original *Final Determination* as well as on remand, that in other proceedings it has found it appropriate to disregard input prices from South Korea and Thailand pursuant to its "longstanding" practice of disregarding surrogate values if it has reason to believe or suspect that the source data may be subsidized. I&D Memo at comment 17. That may well be true, but flat appeal to "the past" does not inherently explain the determination that is being made in the present. More precisely, the fact that Commerce has found it appropriate to disregard prices from Korea and Thailand in past determinations does not give rise to a valid inference of "the existence" during the POI of generally-available, non-industry specific subsidy programs that would be necessary to justify a belief or suspicion that the input prices in question were distorted at the time of the POI of *this* matter.[13] *Cf. Sichuan Changhong Electric*, *supra*, 30 CIT at 1496, 460 F. Supp.

---

[13] By way of further explanation, the court earlier noted, but did not elaborate on, the fact that the I&D Memo for the matter at bar first stated that Commerce "has previously found that it is appropriate to disregard such prices from South Korea and Thailand because we have determined that these countries maintain broadly available, non-industry specific export subsidies". I&D Memo at comment 17. Commerce then stated:

      Based on *the existence* of these subsidy programs that were generally available to all exporters and producers in these countries *at the time of the POI*, the Department finds that it is reasonable to infer that all exporters from South Korea and Thailand may have benefitted from these subsidies. This

(continued...)

2d at 1352 ("[i]t is simply not reasonable to assume that subsidy programs, once established, exist in perpetuity").   It thus behooves Commerce to relate a relevant and contemporaneous factual predicate to the particular period of investigation, not merely to avoid the appearance of ossification of administrative practice, but also as a necessary part of the particularized findings that will suffice for the purpose of the substantial evidence standard of review.

       *CS Wind*, *supra*, 38 CIT ___, 971 F. Supp. 2d 1271, is illustrative of that sufficiency. Concerning an administrative record that also encompassed input prices that Commerce had believed or suspected had been distorted by subsidies and that Commerce had analyzed along the similar path as the matter at bar (and that of many others), *CS Wind* reiterated that the test of *Fuyao Glass* is one reasonable method for evaluating the sufficiency of the evidence upon which Commerce bases its

---

[13]  (...continued)
            is consistent with past practice, where the Department has rejected MEPs
            from Thailand and Korea.
*Id.* (italics added).
       The closest temporal references cited to support that proposition for the purpose of the matter at bar were *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review*, 74 Fed. Reg. 2512 (Jan. 15, 2009), which addresses a period of events that had occurred three years prior to the POI, *i.e.*, for that review, January 1, 2006, through December 31, 2006, and *Wire Decking From the People's Republic of China*, 75 Fed. Reg. 32905 (June 10, 2010) ("*Wire Decking*"), which justified the belief or suspicion of subsidies from South Korea with respect to inputs for that relevant subject merchandise upon *Citric Acid and Certain Citrate Salts From the People's Republic of China*, 74 Fed. Reg. 16838 (Apr. 13, 2009) (final less than fair value determination) ("*Citric Acid*"), which covered the period October 1, 2007 to March 31, 2008.   The trail ends at *Citric Acid*, which simply states, without further citation or support, "[w]e excluded South Korea because we have reason to believe or suspect that prices of inputs from South Korea have been subsidized."   Issues and decision memorandum on *Citric Acid* at comment 11B n.135.
       *Ipse dixit* declarations are not substantial evidence, and having to root through a bureaucratic *matryoshka*-doll of administrative determinations to get to the source of an evidentiary point does not provide ease of understanding.   In this instance, it did not prove "the existence" of relevant, broadly available, non-industry-specific export subsidies for purposes of the POI at bar in any event.

belief or suspicion that input prices are subsidized.  After analyzing the record in relation to each of the three *Fuyao Glass* prongs (*see supra* note 4), *CS Wind* held Commerce's analysis satisfactory because of the relevancy, contemporaneity, and particularity of the referenced proceedings to the administrative record therein considered.  971 F. Supp. 2d at 1292.

        The parties have not had opportunity to provide input on *CS Wind*, but its analysis appears sound in its own right.  The matter at bar, at least with respect to the *Final Determination*, differs from that case as to the lack of any asserted and analyzed contemporaneity in the referenced administrative determinations and demonstrated relevance to the POI to support the belief or suspicion that prices of the relevant inputs were distorted during the POI.  It also lacks particularity or specificity on what are being claimed as the "broadly-available, non-industry specific export subsidies" from South Korea and Thailand.  It may well be true that those countries maintained such subsidies during the period in question.  But those facts were, and are, neither apparent nor inherent in the administrative record: it requires *some* primary source from which it could reasonably be concluded that such programs were *in fact* in existence and operable during the POI, with a degree of specificity in describing the relevant program(s), before the possibility of believing or suspecting that the relevant MEPs during the POI were likely distorted by such programs could even arise.[14]

---

[14]  The administrative record is generally considered as all the information the agency used to make the rule in question.  While it may be the "general administrative law view" that an agency may rely on any useful information whether or not physically contained in the administrative file, for purposes of the substantial evidence standard to which this type of matter is subject it is the agency's inherent duty to develop a complete record.  "Reopening" the record on remand, thus, would not have been for the purpose of a "formal" investigation into whether the inputs from South Korea and Thailand are distorted "in fact", *see supra*, note 9, it would simply have been for the purpose of providing that "information available to it at the time" necessary under the reviewing standard to justify the belief or suspicion that they are distorted, which would encompass specific

(continued...)

In the final analysis, the court is not here persuaded that Commerce on remand has provided a legally correct result, as argued by the petitioners, not least because (its expressed position to the contrary notwithstanding) in the *Redetermination* Commerce has, in fact, supplemented the administrative record -- with references to *Fresh Garlic From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-2011*, 78 Fed. Reg. 36168 (June 17, 2013) (reviewing the Nov. 1, 2010 to Oct. 31, 2011 period) and accompanying I&D Memo at comment 8, and *Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 70533 (Nov. 26, 2013) (reviewing the Apr. 1, 2011, through Mar. 31, 2012 period) and accompanying I&D Memo at comment 5, both of which were apparently undertaken after and covered periods subsequent to the POI.  *See Redetermination* at 16.  But beyond being claimed as support for the practice of inferring that all exporters from a country that "maintains" broadly available, non-industry specific export subsidies may be presumed to have benefitted from such subsidies, those determinations are unexplained, specifically whether they may legally provide the evidentiary sufficiency for excluding APP-China's declared MEP input prices from South Korea and Thailand. They are, however, apparent evidence of record and in apparent contradistinction to reversal on remand of the decision not to use the pricing data from South Korea and Thailand.  Further remand is therefore required to

---

[14] (...continued)

evidence and particular descriptions of the generally available, non-industry specific export programs -- even one example -- claimed to have been in actual contemporary existence and operation during the POI that could reasonably lead to such an inference.  The court merely notes in passing here its superficial awareness of Commerce's "subsidies enforcement library," maintained publically and electronically for the time being at http://enforcement.trade.gov/esel/eselframes.html, but that has not been made part of this record, let alone any relevant part thereof related or explained with specificity or objectivity.

more fully address the record as it stands, or as may yet be supplemented by other "information available to it at the time" as Commerce in its discretion may determine is appropriate (*cf.*, *e.g.*, RCDoc. 10, *supra*), in accordance with the foregoing.  Simply put, Commerce must reach and explain, with precision, whatever result the substantiality of the evidence compels.

## II.  Targeted Dumping Determination

The petitioners also challenge the *Redetermination* with respect to the targeted dumping methodology and remedy applied by Commerce. *See* 19 U.S.C. § 1677f-1(d)(1)(B) (2006); 19 C.F.R. §351.414(f) (2008).

By way of background, it will be recalled that in the *Final Determination* Commerce applied its *Nails* test[15] and found that APP-China's sales' prices had a pattern of pricing that differed significantly among U.S. customers for comparable merchandise during the POI.  Specifically, the analysis found that targeted sales met both the "significant deviation test" threshold and the "gap test" threshold.  *See* I&D Memo at comment 3.  Consequently, in order to compute dumping margins for the *Final Determination*, instead of employing standard average-to-average ("A-A") comparison methodology, which would have concealed differences in pricing patterns between targeted and non-targeted groups, Commerce applied the average-to-transaction ("A-T") comparison methodology[16]

---

[15] *Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 33977 (June 16, 2008) and accompanying issues and decision memorandum at comments 1 through 8; *Certain Steel Nails from the United Arab Emirates: Notice of Final Determination of Sales at Not Less than Fair Value*, 73 Fed. Reg. 33985 (June 16, 2008) and accompanying issues and decision memorandum at comments 1 through 8.  *See* 38 CIT at __, 918 F. Supp. 2d at 1328.

[16] A-A methodology compares the weighted average of the normal values to the weighted
(continued...)

in accordance with 19 C.F.R. §351.414(f)(1) (2008), albeit to all of APP-China's sales.  But subsection (f)(2) of that regulation, as proclaimed at the time, provided that Commerce will also "normally" limit the A-T method to those sales that "constitute targeted dumping."  The prior opinion held that Commerce's announced "interim final rule," without providing for advance notice and comment, had not properly withdrawn that subsection.[17] 38 CIT at ___, 918 F. Supp. 2d at 1327.  Thus, "[a]ssuming the finding of targeted dumping remains positive after reconsideration of other issues addressed in this opinion, Commerce must limit application of the targeted dumping remedy to targeted sales, or provide an adequate explanation as to why the situation is not a 'normal' one before applying the remedy to all APP-China sales."  *Id*. at ___,  918 F. Supp. 2d at 1328.

After making the changes to the calculations in the *Final Determination* with respect to other issues addressed in the prior opinion, Commerce continued to find targeted dumping, in that APP-China's sales prices had a pattern of pricing that differed significantly among U.S. customers for comparable merchandise during the POI, and that the targeted sales met both the "significant deviation test" threshold and the "gap test" threshold.  *Redetermination* at 14.  However, Commerce

---

[16]  (...continued)

average of the export prices for comparable merchandise, whereas A-T methodology compares the weighted average of the normal values to the export price of individual transactions for comparable merchandise .

[17]  *See Withdrawal of Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 73 Fed. Reg. 74930 (Dec. 10, 2008).  Commerce has since published *Non-Application of Previously Withdrawn Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 78 Fed. Reg.  60240 (Oct. 1, 2013), "propos[ing] to continue to not apply the withdrawn provisions governing targeted dumping in antidumping investigations" and soliciting comments on the action, followed by *Non-Application of Previously Withdrawn Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 79 Fed. Reg. 22371 (Apr. 22, 2014) (final rule) (unchanged).

declined to apply a targeted dumping remedy after finding that the weighted-average margin under

both the A-A comparison methodology and the A-T methodology, as limited to the sales that were

found to be targeted, is below the *de minimis* threshold.  *Id*.  Commerce thus[18] applied the standard

A-A methodology to all sales to determine the weighted-average dumping margin.  *Id*. at 14-15.

   In their comments on the draft remand results, the petitioners argued that failure to

apply alternate targeted dumping methodology to all U.S. sales of the exports of subject merchandise

by APP-China constitutes error.  RCDoc 10 (Oct. 28, 2013) at 11 (comments on prelim. remand);

RCDoc. 13 (Nov. 18, 2013) at 7 ("Comments on Disclosure").  They urge that Commerce

(re)consider and find APP-China's targeted dumping to be not normal.  They here argue that in

promulgating the targeted dumping regulation, Commerce noted that the Limiting Rule approach

would not always be "limited" in application, because there may be situations in which targeted

dumping by a firm is so pervasive that the A-T method becomes the benchmark for gauging the

fairness of that firm's pricing practice.  *See Antidumping Duties; Countervailing Duties*, 62 Fed.

Reg. 27296, 27375 (May 19, 1997) (final rule) ("where a firm engages extensively in the practice

of targeted dumping, the only adequate yardstick available to measure such pricing behavior may be

the [A-T] methodology") .

   The petitioners also contend that notwithstanding whatever result Commerce reaches

with regard to the first issue discussed above, *supra*, Commerce's current record consists of legally-

---

[18]   Commerce also disagreed "that the price differences identified cannot be taken into account using the standard [A-A] methodology", albeit due to the fact that the weighted average margins under both the A-A methodology and the A-T methodology as limited to sales found to be targeted were below the *de minimis* threshold.  *See Redetermination* at 14.

relevant extensive, or "widespread" or "pervasive,"[19] sales by APP-China in terms of percentage

volume and value in their own right and also when examined using "Cohen's d" testing, which as

used by Commerce measures the extent of price differentiation in U.S. sales.[20]  *See* Petitioners'

---

[19]  *See* 62 Fed. Reg. at 27375; *see also Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7308, 7350 (Feb. 27, 1996).

[20]   *See Hardwood and Decorative Plywood From the People's Republic of China: Antidumping Duty Investigation*, 78 Fed. Reg. 25946 (May 3, 2013) (preliminary), and accompanying I&D Memo (Apr. 29, 2013) ("*Determination to Apply an Alternative Methodology* . . . B. *Differential Pricing Analysis*"):

> . . . The Cohen's d test is a generally recognized statistical measure of the extent of the difference between the mean of a test group and the mean of a comparison group.  First, for comparable merchandise, the Cohen's d test is applied when the test and comparison groups of data each have at least two observations, and when the sales quantity for the comparison group accounts for at least five percent of the total sales quantity of the comparable merchandise.  Then, the Cohen's d coefficient is calculated to evaluate the extent to which the net prices to a particular purchaser, region or time period differ significantly from the net prices of all other sales of comparable merchandise.  The extent of these differences can be quantified by one of three fixed thresholds defined by the Cohen's d test: small, medium or large.  Of these thresholds, the large threshold provides the strongest indication that there is a significant difference between the means of the test and comparison groups, while the small threshold provides the weakest indication that such a difference exists.  The difference was considered significant if the calculated Cohen's d coefficient is equal to or exceeds the large (*i.e.*, 0.8) threshold.

> Next, a ratio test assesses the extent of the significant price differences for all sales as measured by the Cohen's d test.  If the value of sales to purchasers, regions, and time periods that pass the Cohen's d test account for 66 percent or more of the value of total sales, then the identified pattern of EPs that differ significantly supports the consideration of the application of the [A-T] method to all sales as an alternative to the [A-A] method.  If the value of sales to purchasers, regions, and time periods that pass the Cohen's d test accounts for more than 33 percent and less than 66 percent of the value of total sales, then the results support consideration of the application of an [A-T] method to those sales identified as passing the Cohen's d test as an alternative to the average-to-average method.  If 33 percent or less of the value of total sales passes the Cohen's d test, then the results of the Cohen's d test do not support consideration of an alternative to the [A-A] method.

Comments on Disclosure (output listing, p. 270), RPDoc 12, RCDoc 13 (memorandum to file). They claim their results show that if the alternate methodology were applied only to sales identified by the Cohen's d test, or even to all sales, the result would be a non-*de minimis* margin.  *See id*. (output listing, p. 292).  Thus they argue that the alternate methodology should be applied to all of APP-China's sales.  *See id*. at 7.

Since the other issue being remanded may impact the calculations employed for the targeted dumping analysis, the court need not opine further at this point, but upon remand Commerce is specifically requested to consider and address in greater detail the petitioners' points as raised in their confidential comments filed with the court.

*Conclusion*

This matter is hereby remanded for further proceedings not inconsistent with the foregoing.  The finalized results thereof shall be due October 1, 2014; comment briefs for the court on those results to be filed October 31, 2014; and rebuttal commentary by November 17, 2014.

**So ordered**.

/s/  R. Kenton Musgrave
R.  Kenton Musgrave, Senior Judge

Dated: July  2 , 2014
New York, New York