Slip Op. 15 - 37

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| GOLD EAST PAPER (JIANGSU) CO., LTD., NINGBO ZHONGHUA PAPER CO., LTD., and GLOBAL PAPER SOLUTIONS, | : |
| Plaintiffs, | : Before: R. Kenton Musgrave, Senior Judge |
| and | : Consol. Court No. 10-00371 |
| BUREAU OF FAIR TRADE FOR IMPORTS & EXPORTS, MINISTRY OF COMMERCE, PEOPLE'S REPUBLIC OF CHINA, | : |
| Plaintiff-Intervenor, | : |
| v. | : |
| UNITED STATES, | : |
| Defendant, | : |
| and | : |
| APPLETON COATED LLC, NEWPAGE CORP., S.D. WARREN COMPANY d/b/a SAPPI FINE PAPER NORTH AMERICA, and UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, AFL-CIO-CLC, | : |
| Defendant-Intervenors. | : |

## OPINION AND ORDER

[Remanding second results of administrative redetermination on investigation of sales at less than fair value of certain coated paper from the People's Republic of China.]

Dated: April 22, 2015

*Daniel L. Porter* and *Ross E. Bidlingmaier*, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington DC, for the plaintiffs and plaintiff-intervenor.

*Alexander V. Sverdlov*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington DC, for defendant.  With him on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director.  Of Counsel on the brief was *Mykhaylo A. Gryzlov*, Senior Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce.

*Terence P. Stewart* and *William A. Fennell*, Stewart and Stewart, of Washington, DC, and *Gilbert B. Kaplan*, *Christopher T. Cloutier*, and *Daniel L. Schneiderman*,, King & Spalding, LLP, of Washington DC, for the defendant-intervenors.

Musgrave, Senior Judge: This matter, most lately embodied in the second *Final Results of Redetermination Pursuant to Court Remand* ("RR2") concerning the antidumping duty investigation into *Certain Coated Paper from the PRC*,[1] must be remanded a third time due to arguments over (1) the use of market economy purchase prices for certain inputs procured by/for the plaintiffs (herein "APP-China") from the Kingdom of Thailand ("Thailand") and (2) the targeted dumping methodology utilized on second remand that persuade further remand is appropriate. Familiarity with the prior opinions on the case is presumed, but a brief background is provided below.  *See* 37 CIT ___, 918 F. Supp. 2d 1317 (2013) ("*Gold East I*") and 38 CIT ___, 991 F. Supp. 2d 1357 (2014) ("*Gold East II*").

---

[1] *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China*, 75 Fed. Reg. 59217 (Sept. 27, 2010), PDoc 360, as amended by *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Amended Final Determination of Sales at Less than Fair Value and Antidumping Order*, 75 Fed. Reg. 70203 (Nov. 17, 2010) ("*Final Determination*"), and accompanying issues and decision memorandum ("*IDM*"), PDoc 353.  The period of investigation ("POI") covers January 1, 2009 through June 30, 2009.

*Background*

In the *Final Determination*, the U.S. Department of Commerce, International Trade Administration ("Commerce") averred that pursuant to its practice it disregarded the market economy purchase prices ("MEPs") for inputs that originated from Thailand and the Republic of Korea ("Korea") that APP-China submitted to account for its production. *See IDM* at cmt. 7. *Cf.* 19 U.S.C. §1677b(c)(1) *with* 19 C.F.R. 351.408(c)(1). After considering APP-China's challenge thereto on the basis of relevant precedent[2] and legislative history[3] in comparison with the relevant regulation, *Gold East I* concluded that the record lacked "positive evidence" to support the determination, as articulated, of a belief or suspicion that those inputs had been distorted by subsidies, and that issue was remanded with instruction either "to reopen the record and make particularized findings in support of [the] decision to ignore the Thai and Korean price data . . . or to reverse [the] decision not to use such price data". 37 CIT at ___, 918 F. Supp. 2d at 1324.

Commerce also requested remand in order to examine its targeted dumping calculation program and, if appropriate, correct certain alleged programming errors. The request was endorsed, but the court also concluded that a relevant targeted dumping regulation had not been properly withdrawn through the notice and comment required under the Administrative Procedure Act, 5 U.S.C. §500, *et sequentia*. That regulation is no longer in effect, but during the investigation it had provided, *inter alia*, that the application of the "remedy" of targeted dumping should

---

[2] *See, e.g., Fuyao Glass Indus. Group Co. v. United States*, 29 CIT 109 (2005) ("*Fuyao II*"); *Sichuan Changhong Electric Co. v. United States*, 30 CIT 1481, 460 F. Supp. 2d 1338 (2006).

[3] *See* H.R. Conf. Rep. No. 100-576, at 590 (1988) ("[i]n valuing such factors [of production], Commerce shall avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices"), *reprinted in* 1988 *U.S.S.C.A.N.* 1547, 1623.

"normally" be limited to those sales that "constitute targeted dumping."  *See* 19 C.F.R.

§351.414(f)(2) (2008).  Consistent therewith, therefore, *Gold East I* opined that the targeted dumping

remedy had to be limited to targeted sales or adequate explanation provided as to why the relevant

sales are not "normal".  37 CIT at ___, 918 F. Supp. 2d at 1328.

       In Commerce's first final results of redetermination ("RR1"), it complied with the

opinion on those issues under protest.  *See generally* RR1.  The first results incorporated the prices

of APP-China's inputs from Thailand and Korea and, apparently, limited the targeted dumping

"remedy" in accordance with *Gold East I*, but did not "appl[y]" it.  *Cf.* RR1 at 17 *with id*. at 18

(referring parties to a further discussion of the "proprietary nature of this analysis" in a certain

memorandum dated concurrently with RR1).  Those results relied on average to average ("A-A")

methodology instead of average to transaction ("A-T") methodology.  Considering those results and

the parties arguments thereon, *Gold East II* reiterated why the matter had been remanded and, after

further analysis of Commerce's articulated position on the matter, remanded again for a fuller

analysis either on the record as it stood or as may be supplemented on remand if necessary.  *Gold*

*East II*, 38 CIT at ___, 991 F. Supp. 2d at 1269.[4]

       On second remand, Commerce reopened the record, and the petitioners and

APP-China filed submissions with new factual information pertaining to subsidization.  Considering

---

[4]  In passing, the court observed that the fact that Commerce had placed additional information on the record in the form of additional administrative determinations via citation thereto was at odds with Commerce's position regarding a "reopening" of the record.  *See Gold East II*, 38 CIT at ___, 991 F. Supp 2d at 1366 & n.14 (parameters of the administrative record); *see also* 19 C.F.R. §351.104(a) ("[t]he Secretary will include in the official record all *factual* information, written argument, *or other material* developed by, presented to, or *obtained by the Secretary* during the course of a proceeding that pertains to the proceeding") (italics added).

them, Commerce again determined to use APP-China's claimed prices for inputs from Thailand and

to reject the prices for inputs from Korea in the calculation of the dumping margin. Commerce also

continued to apply the A-A targeted dumping methodology to all sales to calculate APP-China's

dumping margin. The second final remand results ("RR2") did not substantively change from the

draft thereof, but they provide further explanation of the determinations made in the calculation of

a weighted-average dumping margin for APP-China of zero percent.

　　　　　APP-China argues the second remand results should be sustained. The petitioners

agree with them in part, but they continue to contest Commerce's determination to use market

economy prices ("MEPs") for inputs purchased by APP-China from Thailand and the determination

not to counteract targeted dumping. For the following reasons, the matter must be remanded again.

*Discussion*

I. Administrative Finality and Information on the Record

　　　　　On second remand, Commerce took the position that it was appropriate to disregard

any information submitted for the record that "only became available" subsequent to the

determination of the original investigation.[5] RR2 at 22.

　　　　　Disregard of information that "only became available" subsequent to the original

investigation in the sense of "only came into being" through creation subsequent to the original

investigation accords respect for that point at which an agency's determination may reasonably be

---

[5] Commerce further explains that "while certain factual information submitted by Petitioners may have been available during the POI, . . . the Department continues to rely on its published determinations, and the contemporaneity of such determinations to the POI, to determine whether there is evidence of the existence of generally available, non-industry specific export subsidies during the POI." RR2 at 22.

concluded "final" in the administrative sense.  *See* RR2 at 7 ("[o]therwise, the Department's decisions would not have administrative 'finality' and would be subject to newly-developed documents and facts with the passage of time, when litigation is pursued").  *Cf. Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012) ("*Essar*") (generally improper for courts to "require" reopening the record).  Commerce's disregard of information that only came into being subsequent to the original investigation is appropriate, but the reader should not confuse or conflate a "final" decision thereon with the applicability of law or methodology on remand.  *See infra*.

## II.  Treatment of the Certain Input Purchases

### A.  MEP Inputs from Korea

Regarding the relevant MEP inputs from Korea, Commerce found that *2009 CORE Review*[6] provides evidence that Korea maintained at least one countervailable generally-available, non-industry specific export subsidy program and that it would have been against any market economy supplier's interest in Korea not to take advantage of the subsidy.  *Gold East I* characterized the mere reference to *2009 CORE Review* in the *Final Determination*'s issues and decision memorandum as "insufficient" evidence of record to justify disregard of APP-China's MEP inputs. *Gold East I*, 37 CIT at ___, 918 F. Supp. 2d at 1324.  *See also*, *e.g.*, *Gold East II*, 38 CIT at ___, 991 F. Supp. 2d at 1362.  At this stage, Commerce's particularized explication of *2009 CORE Review* satisfies the three prongs of *Fuyao II* and provides substantial evidentiary support for disregarding the relevant MEP inputs from Korea, which no party contests.  *See* RR2 at 11-14.

---

[6] *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Preliminary Results of Countervailing Duty Administration Review*, 73 Fed. Reg. 52315, 52323-24 (Sep. 9, 2008) ("*2009 CORE Review*"); unchanged in final determination, *see* its accompanying issues and decision memorandum at cmt. 1.

## B.  MEP Inputs from Thailand

### 1.  Thailand's Investment Promotion Act of 1977 ("IPA")

Regarding the issue of MEPs for certain inputs from Thailand, the petitioners called Commerce's attention to several cases of countervailed sections of Thailand's Investment Promotion Act ("IPA") from 1989 to 2001, including "countervailable" export subsidy benefits under the IPA in *1995 Pocket Lighters* investigation.[7]  The petitioners argued that the record evidence demonstrated that the IPA was still in effect during the POI, that the suppliers were eligible for and thus likely received benefits under the IPA, and that it would have been unnatural for the suppliers not to have taken advantage of the subsidies under the IPA because of the competitive nature of market economy countries and the supplier's demonstrative interest in receiving available subsidies by applying for promoted status.

Commerce disagreed, explaining that although it had countervailed programs under sections of the IPA as early as the *1989 Malleable Iron Pipe Fittings* investigation[8], it had made such determinations on a case-by-case and industry-specific basis, which led to differing results depending upon the type of monitoring system employed with respect to each particular industry.  Consistent therewith, Commerce found that its prior findings concerning section 36(1) of the IPA (*i.e.*, duty

---

[7]  *Final Negative Countervailing Duty Determination: Disposable Pocket Lighters From Thailand*, 60 Fed. Reg. 13961 (Mar. 15, 1995) ("*1995 Pocket Lighters*").  Actually, that proceeding determined the "net bounty or grant" as 0.23 percent, *ad valorem*, which was not countervailable. *See id*. at 13962.

[8]  *Final Affirmative Countervailing Duty Determination and Countervailing Duty Order: Malleable Iron Pipe Fittings From Thailand*, 54 Fed. Reg. 6439 (Feb. 10, 1989) ("*1989 Malleable Iron Pipe Fittings*").

exemptions on imports of raw and essential materials) in *2001 Hot-Rolled Investigation*[9] did not

establish that Thailand maintained countervailable broadly-available, non-industry specific export

subsidies at the time of the original *Final Determination*.   RR2 at 9.

    Elaborating on the specific programs determined countervailable in *2001 Hot-Rolled*

*Investigation*, Commerce explained that in that determination it countervailed a program under

sections of the 1991 version of the IPA because it determined that the IPA benefits were *de facto*

specific to a steel-sheet industry within the meaning of 19 U.S.C. §1677(5A)(D)(iii)(I) and the

program was not administered in a manner in accordance with 19 C.F.R. §351.519(a)(4)(i), even

though it determined that the assistance provided by the Thai Board of Investment under the IPA did

not constitute an export subsidy.  *Id*. at 18.  By way of contrast, Commerce noted that in the *2005*

*PET Resin* investigation[10] it had found the import duty exemptions on imports of raw and essential

materials under section 36 of the IPA not to be countervailable within the meaning of 19 C.F.R.

§351.519(a)(4).  *Id*.  Commerce further explained that in that proceeding it had not determined that

the IPA is an export subsidy *per se*, because the IPA did not generally require an export commitment

and Commerce had examined the manner in which the Thai government administered the duty

drawback program, finding that the system used to monitor and track the consumption and/or

---

 [9] *Final Affirmative Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat Products From Thailand*, 66 Fed. Reg. 50410 (Oct. 3, 2001) ("*2001 Hot-Rolled Investigation*") and accompanying issues and decision memorandum.

 [10] *Final Negative Countervailing Duty Determination: Bottle-Grade Polyethylene Tereph-thalate (PET) Resin From Thailand*, 70 Fed. Reg. 13462 (Mar. 21, 2005) ("*2005 PET Resin Investigation*") and accompanying issues and decision memorandum.

re-export of imported goods, along with normal allowance for waste, was reasonable and effective.

Therefore, Commerce explains,

> [t]his demonstrates that the Department's prior subsidy findings on the IPA were industry-specific and led to differing results depending upon the type of monitoring system employed with respect to each particular industry. Accordingly, we find that the Department's findings concerning section 36(1) of the IPA (i.e., duty exemptions on imports of raw and essential materials) in *2001 Hot-Rolled Investigation* do not establish that Thailand maintained countervailable broadly available, non-industry specific export subsidies at the time of the *Final Determination*.

*Id.* at 9. *See* 66 Fed. Reg. 50410 and accompanying issues and decision memorandum, section II.A.

Commerce's explanation of the nonapplicability of its prior IPA findings to the subject matter at bar

is reasonable and supported by substantial evidence of record. *See*, *e.g.*, *MTZ Polyfilms, Ltd v.*

*United States*, 33 CIT1575, 1582, 659 F. Supp. 2d 1303, 1311 (2009) (proposed methodology not

"relevant to" and "does not comport with" how Commerce treated export program benefits).

### 2. Export-Import Bank of Thailand 2009 Statements

The petitioners also cited to mission statements from the 2009 annual report of the

Export-Import Bank of Thailand to argue that the bank was funded by the Thai government to cover

losses on loans and credit insurance provided to exporters, and that it would be unnatural for

APP-China's Thai suppliers not to have taken advantage of the program. Commerce, however,

responded that it has not countervailed a program under the Export-Import Bank of Thailand, and

that therefore the above assertion in the mission statements of the bank's annual report is, by itself,

insufficient for finding that any Thai company received countervailable export subsidies through

programs from the Export-Import Bank of Thailand during the POI. Substantial evidence of record

supports this determination.

### 3. Thai Tax Coupon Program

#### a. Further Background

On remand, the petitioners argued that the record now contained the same law governing the Thai tax coupon program[11] that was countervailed in *1992 Carbon Steel Butt-Weld Pipe Review* as well as documentation that a change was made to the tax coupon law in 2009 and the *ad valorem* export coupon rates applicable during 2009 for the inputs exported from Thailand. *See* Petitioners' Submission of New Information (Aug. 20, 2014) at Exhibits 1, 2A & 2B.  The petitioners argued this evidence demonstrated that the tax coupon program was still in place during 2009 and that APP-China could have benefitted from the program.  Petitioners' Comments on Draft Second Remand Redetermination (Oct. 9, 2014) at 10.

Commerce interpreted *Gold East II* as ordering it to address whether subsidies existed during the POI of this instant investigation.[12]  The interpretation led to disregarding the petitioners' evidence and determining that Commerce did not have a reason to believe or suspect that prices may have been subsidized, on the grounds that it has not countervailed the tax coupon program as an

---

[11] The petitioners aver this is Thailand's Tax and Duty Compensation of Exported Goods Produced in the Kingdom Act, B.E. 2524 (1981).  *Cf. Carbon Steel Butt-Weld Pipe Fittings From Thailand; Preliminary Results of Countervailing Duty Administrative Review*, 56 Fed. Reg. 55283, 55283-84 (Oct. 25, 1991) ("*Carbon Steel Butt-Weld Pipe Review*").

[12] In the process, Commerce highlighted the prior decision's observation that "detailed positive evidence of that existence -- during the POI -- of broadly-available, non-industry specific subsidies has been held to satisfy this prong", and from other context that "[i]t thus behooves Commerce to relate a relevant and contemporaneous factual predicate to the particular period of investigation, not merely to avoid the appearance of ossification of administrative practice, but also as a necessary part of the particularized findings that will suffice for the purpose of the substantial evidence standard of review."  RR2 at 15-16, quoting *Gold East II*, 38 CIT at ___, 991 F. Supp. 2d at 1363 (referencing *CS Wind Vietnam Co., Ltd. v. United States*, 38 CIT ___, ___, 971 F. Supp. 2d 1271, 1292 (2014) ("*CS Wind*")) & 38 CIT at ___, 991 F. Supp. 2d at 1365.

export subsidy since the *1997 Apparel Review*[13] and that all the orders countervailing the tax coupon program had been revoked by 2000.[14]  Commerce reasoned that the subsidization determinations concerning the tax coupon program from the 1980s and 1990s were "not sufficiently contemporaneous with the POI of the instant investigation" to accord with the order of remand.  RR2 at 9-10, 15-17.

> Though Petitioners placed on the record evidence of the law in 2009 governing the tax coupon after we opened the record, the Department is not required in the context of this antidumping duty investigation to conduct a formal investigation of this alleged subsidy program and make [a] *de novo* determination that this law establishes a generally available countervailable export subsidy program in Thailand. Because we did not make any subsidization determinations on the tax coupon program in other CVD reviews or investigations that are sufficiently contemporaneous with the POI, we are not relying on the evidence of the law alone to conclude that countervailable export subsidies existed during the POI.

*Id*. at 16-17 (footnotes omitted).

### b.  Analysis

Commerce's conclusion that "no information generally available to it at the time of the *Final Determination* supports a finding that the MEP prices for inputs from Thailand during the POI may have been distorted because of countervailable export subsidies" is not supported by substantial evidence for the following reasons, and therefore the matter of whether there is a reason to believe or suspect that MEPs from Thailand were distorted would require further consideration *if* it presents a material impact on the results.  However, it is unclear at this time whether that would have a material impact on the results or should be regarded as harmless error.  *Cf. infra*, notes 25-26.

---

[13]  *Certain Apparel From Thailand; Final Results of Countervailing Duty Administrative Review*, 62 Fed. Reg. 63071 (Nov. 26, 1997) ("*1997 Apparel Review*").

[14]  *See* RR2 at 10 & n.49.

Commerce bases its decision in part on its observation that all the orders countervailing the tax coupon program had been revoked by the year 2000.  In one sense, that would not be unreasonable.  *Cf. AK Steel Corp. v. United States*, 192 F.3d 1367, 1376 (1999) (clear that the Korean government exercised control to benefit a particular industry at one time but court not referred to evidence to support reasonable inference that governmental control continued into the period of investigation).  However, to the extent Commerce interpreted the law of the case as expressing that "the standard for determining the existence of generally available non-industry-specific export subsidies is a particularized finding of subsidization during the POI" requiring a new, *de novo*, determination of subsidization as a result of those revocations, Commerce's interpretation is overly restrictive.  Revocation is a discrete agency action, and the act thereof does not invalidate the prior administrative findings and conclusions upon which the issuance of the countervailing or antidumping duty order being revoked was validly predicated.  Indeed, that is basically the premise that Commerce sought to advance in *Canadian Wheat Bd. v. United States*, 32 CIT 1116, 580 F. Supp. 2d 1350 (2008), *aff'd* 641 F.3d 1344 (Fed. Cir. 2011).  Commerce here noted that the tax coupon program had been countervailed in the *1997 Apparel Review*,[15] and the petitioners had placed on the record the law in 2009 governing the tax coupon program to show that the program existed in 2009, not to induce a formal investigation.  On those facts, Commerce could have reasonably inferred that the tax coupon program continued to exist during the POI.

To the extent Commerce interpreted the prior opinions as at odds with its "practice" of imposing a rebuttable presumption from a past affirmative subsidy determination that the

_____

[15]  *See* RR2 at 10, referencing *1997 Apparel Review*.

particular program "exists" for purposes of a period under consideration,[16] certain clarification is

necessary here:  In neither the *Final Determination* nor the first remand results did Commerce ever

explain that its finding was predicated on the basis of a rebuttable presumption,[17] Commerce simply

(1) stated that it had determined in the past that Korea and Thailand "maintain" broadly available

non-industry specific export subsidy programs and (2) declared from citations to same that such

programs were in "existence" during the POI.  Yet, "[i]t is well established that an agency's action

must be upheld, if at all, on the basis articulated by the agency itself."[18]  *Motor Vehicle Mfrs. Ass'n*

*v. State Farm*, 463 U.S. 29, 50 (1983).  Courts are thus bound not to sustain on grounds not

articulated by the agency itself.  *See*, *e.g.*, *Burlington Truck Lines, Inc. v. United States*, 371 U.S.

---

[16]   The second remand results explain that in countervailing duty proceedings "if the Department has countervailed an export subsidy in a prior determination, unless parties provide us with the evidence that the program has been terminated and flow of the residual benefits has ceased, we will normally find that the subsidy is still in existence." RR2 at 16.  *Cf.* 19 C.F.R. §351.526(d) ("Terminated programs") ("The Secretary will not adjust the cash deposit rate under paragraph (a) of this section if the program-wide change consists of the termination of a program and: (1) The Secretary determines that residual benefits may continue to be bestowed under the terminated program . . . ."); *ALZ N.V. v. United States*, 27 CIT 1265, 1284, 283 F. Supp. 2d 1302, 1318 (2003) ("Commerce regularly requires direct evidence of a program-wide change in a subsidy program before it adjusts the cash deposit rate") (citations omitted).

[17]   In point of fact, it was the court, not Commerce, that first brought up the subject of presumptions in the context of the matter at bar.  *See*, *e.g.*, *Gold East II*, 38 CIT at ___, 991 F. Supp 2d at 1360-67.  *Cf.* RR1 generally; Def's 56.2 Resp. at 6-7, 16, 28-33; Def's RR2 Resp. to Cmts at 4-8.  The petitioners here also call attention to *Peer Bearing Company-Changshan v. United States*, 27 CIT 1763, 1772, 298 F. Supp. 2d 1328, 1337 (2003) (opining that once Commerce has presented evidence supporting a reason to believe or suspect that prices are subsidized "a rebuttable presumption is established that the prices paid are distorted" and the burden shifts to the challenging party "to present evidence demonstrating that its supplier did not benefit from such subsidies").

[18]   *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency").

156, 168-69 (1962).  Taking Commerce at its word in the *Final Determination*, the court could not

discern from the record and referenced citations the validity of either assertion for purposes of the

POI,  *i.e.*, that Korean and Thai broadly available non-industry specific export subsidy programs

"existed" during the POI.[19]  *See, e.g.*, *Gold East I*, 37 CIT at ___, 918 F. Supp. 2d at 1324 ("there

must be some positive evidence on the record to permit the court to evaluate whether Commerce's

decision is supported by substantial evidence"); *Gold East II*, 38 CIT at ___, 991 F. Supp. 2d at 1365

& n.13 (examining record support for declared existence of relevant subsidy programs).  That

inference was a necessary precursor for further presuming (*i.e.*, providing reason to believe or

suspect) that the MEPs of the inputs at issue were likely distorted, and therein lay the problem of

APP-China's original *res* on this matter.

To the extent Commerce would regard the prior opinions and *Fuyao II* as at odds with

its, now apparent, rebuttable presumption practice on this issue, clarified here is why those decisions

are not at odds with such practice.  In the *Final Determination*, Commerce quoted from *China

National Machinery Import & Export Corp. v. United States*, 27 CIT 1553, 1557, 293 F. Supp. 2d

1334, 1338 (2003), upon which *Fuyao II* relies, to the effect that "it is sufficient if the Department

has 'substantial, specific, and objective evidence in support of its suspicion that the prices are

---

[19]  Notwithstanding Commerce's interpretation expressed in RR2, it was for this reason that the court previously stated that there must be "*some* primary source from which it could reasonably be concluded that such programs were in fact in existence and operable during the POI, with a degree of specificity in describing the relevant program[s], before the possibility of believing or suspecting that the relevant MEPs during the POI were likely distorted by such programs could even arise."  *See* RR2 at 5, quoting *Gold East II*, 38 CIT at ___, 991 F. Supp. 2d at 1366 (italics in original).

distorted.'"  *IDM* at cmt. 17, pp. 44-45 (also referencing H.R. Rep. Conf. 100-576 at 590).[20]

Considering the circumstances before it, the *Fuyao II* court unpacked those concepts in stating that

"Commerce must demonstrate by specific and objective evidence that (1) subsidies of the industry

in question existed in the supplier countries during the period of investigation . . . ; (2) the supplier

in question is a member of the subsidized industry or otherwise could have taken advantage of any

available subsidies; and (3) it would have been unnatural for a supplier to not have taken advantage

of such subsidies."  *Fuyao II*, 29 CIT at 114.  But whether the concern is over an industry-specific

subsidy program or a broadly available non-industry specific export subsidy program, *Fuyao II*'s

summation amounts to a rather straightforward restatement of how to evaluate the "substantial,

specific, and objective evidence" that would satisfy the reviewing standard of substantial evidence

on the record and assist in evaluating the validity of the inference or conclusion drawn therefrom.

Furthermore, as previously mentioned, *Fuyao II* is not the only "reasonable method

for evaluating the sufficiency of the evidence upon which Commerce base[s] its belief or suspicion

that prices were subsidized", *see CS Wind*, 38 CIT at ___, 971 F. Supp. 2d at 1292, and in the

meanwhile, *Fuyao II* provides useful guidance, and therefore administrative "reasonable suspicion"

conclusions, established via rebuttable presumption or otherwise, should either be able to satisfy its

three prongs or be articulated with sufficient clarity to explain why the chosen method reasonably

gives rise to a valid belief or suspicion that input prices are distorted.  *See id.* at 1292 n .14.

---

[20] *See also China National Machinery,* 27 CIT at 266-67, 264 F. Supp. 2d at 1239, discussing *AL Tech Specialty Steel Corp. v. United States*, 6 CIT 245, 247, 575 F. Supp. 1277, 1280 (1983) and restating the analysis of *Terry v. Ohio*, 392 U.S. 1 (1968) upon *United States v. Cortez*, 449 U.S. 411 (1981) and *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320-21 (1978).

And, if Commerce perceives anything in this opinion that could be construed as inconsistent with its reading of the prior opinions, then this opinion controls.

### III.  Targeted Dumping Redetermination

#### A.  Background

It will be recalled that the Limiting Rule described that if the criteria for targeted dumping are satisfied,[21] then in the comparison of normal value and export price Commerce "normally will limit the application of the average-to-transaction method to those sales that constitute targeted dumping" for purposes of determining sales at less than fair value.  *See* 19 C.F.R. §351.414(f)(2) (2008); *see also* 19 U.S.C. § 1677f-1(d)(1)(B).  Regarding the attempt to withdraw that then-existing targeted dumping regulation, *Gold East I* held that due to noncompliance with the notice provision of the Administrative Procedure Act ("APA"), as amended, 5 U.S.C. §553(b)*,* the Limiting Rule was still in effect at the time of the *Final Determination* and remanded the case for reconsideration of the targeted dumping analysis.  *See* 37 CIT at ___, 918 F. Supp. 2d at 1328.

In light of the first remand results, the court refrained from addressing the parties' further arguments thereon, due to the uncertain impact of the MEP subsidization issue upon the targeted dumping analysis, but it requested that Commerce further address the defendant-intervenors' (herein "petitioners") points on the issue.  38 CIT at ___, 991 F. Supp. 2d at 1369.  On second remand, Commerce found that the exclusion of APP-China's MEP price for the input from Korea did not materially affect the targeted dumping analysis results and, as in the first remand, it continues to find that the weighted-average margin resulting from either the average-to-average ("A-A")

---

[21] *Inter alia*, "determined through the use of, among other things, standard and appropriate statistical techniques . . . ." 19 C.F.R. §351.414(f)(1)(i) (2007).

methodology or the average-to-transaction ("A-T") methodology, as applied only to the sales found to have been targeted, is below the *de minimis* threshold.  Accordingly, Commerce continues to apply the standard A-A comparison methodology to all sales to calculate the weighted-average dumping margin for APP-China.

### B.   Motion to Reconsider -- Effect of Limiting Rule Withdrawal

On remand, pointing to the recent case of *Beijing Tianhai Industry Co. v. United States*, 38 CIT ___, 7 F. Supp. 3d 1318, 1333-34 (2014) ("*Tianhai*"), the petitioners argued that the withdrawal of the targeted dumping regulation was harmless error, and that A-T methodology should be applied to all of APP-China's sales based on their results of testing for Cohen's *d*, part of the differential pricing analysis Commerce adopted subsequent to the *Final Determination*.  *See* Petitioners' Comments on Draft Second Remand Redetermination  at 8-9.  Commerce responded that the United States has already raised the harmless error argument, and since it was not accepted, the law of the case is binding.  RR2 at 23-24.  *Cf. Gold East I*, 37 CIT at ___, 918 F. Supp. 2d at 1325-28.  The petitioners move at this juncture for reconsideration of the issue.

The APA requires that a court take "due account" of the harmless error rule.  5 U.S.C. § 706.  *Tianhai* proceeded from the proposition that the "'relevant harm' to be analyzed when the Department fails to comply with the APA's notice and comment procedures is whether 'an interested party has lost the opportunity to alter the agency's decision through full participation in the regulatory process.'" *Tianhai*, 38 CIT at ___, 7 F. Supp. 3d at 1333 (citing *Parkdale International, Ltd. v. United States*, 31 CIT 1229, 1237, 508 F. Supp. 2d 1338, 1348 (2007)) ("*Parkdale*").[22]

---

[22]   The quote appears in a discussion of when a claim accrues against "final agency action"
(continued...)

*Tianhai* went on to determine that Commerce's failure to follow the procedural requirements of the APA constituted "harmless error" because the party claiming the error had not filed comments on the withdrawal of the regulations during either of the two times when comments were solicited.[23] *Id*., 38 CIT at ___, 7 F. Supp. 3d at 1334-37.  Here, the petitioners argue that, as in *Tianhai*, APP-China filed no comments on the withdrawal when comments were solicited and that therefore any procedural failure by Commerce must be considered as "harmless error."

      "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Royal Thai Government v. United States*, 30 CIT 1072, 1074, 441 F. Supp. 2d 1350, 1354 (2006), quoting *Doe v. New York City Department of Social Services*, 709 F.2d 782, 789 (2d Cir. 1983) (quotation marks omitted).  Thus, the court will not exercise discretion to disturb a previous decision unless it is manifestly erroneous.  *Id*. (citation omitted).  Upon further consideration, the court perceives no manifest error in *Gold East I*.

      In *Parkdale*, the relevant issue concerned whether a certain "reseller policy" was void because it had not been passed in accordance with the procedural requirements of the APA governing the publication of regulations.  *Parkdale* proceeded from the proposition that "if a rule adopts a new

---

[22]  (...continued)
(*see* 5 U.S.C. §704), to wit: "A claim raising procedural objections accrues at the time that the rule goes into effect because the relevant harm has already been inflicted: an interested party has lost the opportunity to alter the agency's decision through full participation in the regulatory process." *Parkdale*, 31 CIT at 1237, 508 F. Supp. 2d at 1348-49 (citations omitted).

[23]  *See Targeted Dumping in Antidumping Investigations*, 72 Fed. Reg. 60651 (Oct. 25, 2007); *Proposed Methodology for Identifying and Analyzing Targeted Dumping in Antidumping Investigations*, 73 Fed. Reg. 26371 (May 9, 2008).

position inconsistent with an existing regulation, or effects a substantive change in the regulation, notice and comment are required." *Parkdale*, 31 CIT at 1246, 508 F. Supp. 2d at 1356 (internal quotation marks omitted), quoting *United States Telecom Association v. FCC*, 400 F.3d 29, 35 (D.C. Cir. 2005) (quoting *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 100 (1995)) (emphasis omitted in *Parkdale*).  After considering the relevant policy, *Parkdale* found that it "is not a new position inconsistent with the existing regulation" and thus notice and comment were not required.

The decision in *Gold East I* is in accord with the line of cases that extend from *Braniff Airways v. CAB*, 379 F.2d 453 (D.C. Cir. 1967) ("*Braniff*"), which evaluated the administrative law question posed therein on the basis of whether the "mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of the decision reached."  379 F.2d at 466, quoting *Massachusetts Trustees of Eastern Gas and Fuel Associates v. United States*, 377 U.S. 235, 248 (1964) ("*EGFA Trustees*").  In *United States Steel Corp. v. EPA*, 595 F.2d 207 (5th Cir. 1979) ("*U.S. Steel*"), for example, the Fifth Circuit held that the EPA's failure to provide notice and comment in advance of designating certain areas in Alabama as nonattainment areas "plainly affected the procedure used, and we cannot assume that there was no prejudice to the petitioners[;] [a]bsence of such prejudice must be clear for harmless error to be applicable."  *See* 595 F.2d at 215. and cases cited.  The petitioners in that case faced "collateral effects" as a consequence of the EPA's action, and the agency's acceptance of comments after the effective date of the designations did not cure the lack of prior notice and comment.  *Id*.

The case of *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479 (9th Cir.1992) is further instructive on this point.  After observing that "the notice and comment requirements . . . are

designed to ensure public participation in rulemaking", 958 F. 2d at 1485, the court went on to state

as truism that a court

> must exercise great caution in applying the harmless error rule in the administrative
> rulemaking context. The reason is apparent: Harmless error is more readily abused
> there than in the civil or criminal trial context. An agency is not required to adopt a
> rule that conforms in any way to the comments presented to it. So long as it explains
> its reasons, it may adopt a rule that all commentators think is stupid or unnecessary.
> Thus, if the harmless error rule were to look solely to result, an agency could always
> claim that it would have adopted the same rule even if it had complied with the APA
> procedures. To avoid gutting the APA's procedural requirements, harmless error
> analysis in administrative rulemaking must therefore focus on the process as well as
> the result. We have held that the failure to provide notice and comment is harmless
> only where the agency's mistake "clearly had no bearing on the procedure used or the
> substance of decision reached."

958 F.2d at 1487, quoting *Sagebrush Rebellion, Inc. v. Hodel*, 790 F.2d 760, 764-65 (9th Cir.1986)

(quoting *Braniff*, *supra*, 379 F.2d at 461) (further citations omitted).   *See also*, *e.g.*, *Natural*

*Resources Defense Council v. Abraham*, 355 F.3d 179 (2d Cir. 2004) (suspension or delayed

implementation of a rule normally constitutes substantive rulemaking requiring notice and

opportunity for comment; DOE's withdrawal of published final rules and replacement with less

stringent standards without notice and comment held not to be a valid exercise of agency authority);

*Natural Resources Defense Council, Inc. v. EPA*, 683 F.2d 752 (3d Cir. 1982).

As discussed in *Gold East I*, Commerce's *Withdrawal of Regulatory Provisions*

*Governing Targeted Dumping in Antidumping Duty Investigations*, 73 Fed. Reg. 74930 (Dec. 10,

2008) ("Withdrawal Notice") plainly resulted in a substantive rule change[24] and a new position

---

[24]   *Parkdale* provides an excellent summation of the distinction between legislative
(substantive) and interpretive rules. *See* 31 CIT at 1246, 508 F. Supp. 2d at 1356 ("'[A]n interpretive
statement simply indicates an agency's reading of a statute or a rule.  It does not intend to create new
rights or duties, but only reminds affected parties of existing duties'"), quoting *Paralyzed Veterans*
(continued...)

inconsistent with existing regulation or effected a substantive change in the regulation. 37 CIT at

___, 918 F. Supp. 2d at 1325. *Cf. Parkdale*, 31 CIT at 1246, 508 F. Supp. 2d at 1356. As further

implied in *Gold East I*, because the Withdrawal Notice was found not to meet the APA's good cause

exception, 5 U.S.C. §553(b)(3)(B), and because of the uncertainty surrounding the two requests for

comments on targeted dumping methodology generally, it could not (and cannot) be concluded that

the Withdrawal Notice's noncompliance with APA notice and comment had been without "bearing

on the procedure used" nor can the procedure Commerce did pursue be assumed non-prejudicial to

APP-China. *See*, *e.g.*, *U.S. Steel*, 595 F.2d at 215. *Cf. EGFA Trustees*, 377 U.S. at 248; *Braniff*, 379

F.2d at 412. At the time *Gold East I* was issued, it was not incorrect, notwithstanding how

Commerce has developed its targeted dumping methodology in the period since its issuance. For

these reasons, the court perceives no reason to disturb its prior decision.

### B. Administrative Finality and Application on Remand of Law, Policy, Methodology, *Et Cetera*

#### 1. Background

As mentioned, in remanding this matter, the court requested Commerce to consider

and address in greater detail the petitioners' points on the issue of targeted dumping as raised in their

confidential brief. In commenting on the draft of the second remand results, the petitioners argued

that their points with respect to applying the exception to the Limiting Rule had not been properly

addressed in the draft in accordance with *Gold East II.* In particular, they contended that their

---

[24] (...continued)
*of Am. v. West*, 138 F.3d 1434, 1436 (Fed. Cir. 1998) (quoting *Orengo Caraballo v. Reich*, 11 F.3d
186, 195 (D.C. Cir. 1993)).

allegation that APP-China's targeted dumping was not "normal" but was so pervasive that it is appropriate to apply the A-T methodology to all of APP-China's sales was not properly analyzed.

        In the second remand results, Commerce responded that it is incumbent on a party before it to make specific arguments in each particular administrative proceeding including during remand in order for the agency to be able to consider them, that the petitioners' targeted dumping points had been addressed in the *First Remand Redetermination* as well as the United States' response brief before the court, and that the court had not ruled in favor of them.   Commerce continued to disagree that the targeted dumping among APP-China's sales is abnormal, and it repeated the *First Remand Redetermination's* articulation that the only circumstances that may support applying the A-T  methodology to all sales

> include when "targeted dumping by a firm is so pervasive that the A-T methodology
> becomes the best benchmark for gauging the fairness of that firm's pricing
> practices,"[ ] or alternatively, when "targeted dumping practice is so widespread it
> may be administratively impractical to segregate targeted dumping pricing from the
> normal pricing behavior of a company."[ ]  We find neither of these circumstances
> is present here. . . .  Moreover, we discern no other distinguishing facts or features
> of the U.S. sales (targeted or otherwise), and Petitioners did not articulate[ ]any
> either, that would justify the conclusion that the "normal" targeted dumping analysis
> is inappropriate.   Accordingly, consistent with our past practice, which was
> previously affirmed by this Court, we declined to find that the specific circumstances
> of this case are abnormal.

RR2 at 24-25, quoting RR1 at 18 (footnotes omitted).

        Commerce thus maintains that APP-China's U.S. sales did not present an abnormal situation that warranted the application of the A-T methodology to all sales because neither of the listed circumstances occurred here.[25]  Commerce interpreted the petitioners to argue that the current

---

[25]  In passing, Commerce also calls attention to the fact that the level of targeted dumping
(continued...)

administrative differential pricing analysis based on Cohen's *d* should be applied "with respect to APP-China" and Commerce declined to do so because the differential pricing methodology was not in effect at the time of the *Final Determination*.  RR2 at 25.  To analyze the extent of the alleged targeted dumping, Commerce therefore applied the targeted dumping test that was in effect at the time of the *Final Determination* based on the *Steel Nails* test.[26]  From the result thereof, Commerce determined it was appropriate to continue to apply the A-A methodology to all of APP-China's sales to calculate its dumping margin because even after accepting APP-China's purchase prices from Thailand, the dumping margin continues to be *de minimis* under either A-A methodology applied to all sales or A-T methodology applied only to targeted sales in accordance with the Limiting Rule.

The petitioners argue Commerce's reasoning is flawed.  They contend that on second remand they highlighted to Commerce the extent to which APP-China engaged in targeted dumping

---

[25] (...continued)
remained the same from that of the first remand results because the change in the margin calculation affected only normal values and not U.S. prices, which is the case "regardless of whether the Department accepted *any* of the MEP input prices".  RR2 at 25 (italics added).  The court remains unclear as to what this implies, for Commerce does not here state "all", *cf.* RR1 at 5, , and the issue of MEP inputs from Thailand is being remanded, *supra.*

[26] *See Certain Steel Nails from the People's Republic of China: Final Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 33977 (June 16, 2008) and accompanying issues and decision memorandum at comments 1 through 8; *Certain Steel Nails from the United Arab Emirates: Notice of Final Determination of Sales at Not Less than Fair Value*, 73 Fed. Reg. 33985 (June 16, 2008) and accompanying issues and decision memorandum at comments 1 through 8.  "Under the Department's *Steel Nails* test, the *extent* of an alleged targeted dumping is measured by dividing the total quantity of the targeted sales which passed the gap test by the total quantity of a respondent's U.S. sales.  In this case, record evidence shows that the percentage of alleged targeted sales with respect to APP-China's total U.S. sales when the Department accepted the MEP prices from both . . . Korea and Thailand in the *First Remand Redetermination* does not change when the Department accepted the MEP prices only from Thailand in this instant remand."  RR2 at 25 n.116 (italics added).  *Cf. supra*, section II.B.3.b.

and noted Commerce's statement when it promulgated its targeted dumping regulation that "where a firm engages extensively in the practice of targeted dumping[ ] the only adequate yardstick available to measure such pricing behavior may be the average-to-transaction methodology." Petitioners' Comments on Second Remand Redetermination at 3-8, quoting *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27375 (May 19, 1997) (final rule).  They contended they had undertaken the Cohen's *d* test as an "additional means" of examining the extent to which APP-China engaged in targeted dumping, *id*. at 5-7, and that based on this information they requested Commerce to consider the data and employ the alternate methodology to determine dumping for APP-China.  *Id*. at 8.  At this stage, they argue that Commerce's refusal to apply the Cohen's *d* test to measure even the pervasiveness of targeted dumping, on the ground that "the differential pricing methodology was not in effect at the time of the *Final Determination*," RR2 at 25, misses the point, because at the time of the *Final Determination* there was no test for determining when the exception to the Limiting Rule applied.  They argue here that they did not ask Commerce to replace the *Nails* test for targeted dumping used in the investigation with the alternative "differential pricing" methodology, which came into being shortly before (and unbeknownst to the court at) issuance of *Gold East I* in 2013, but rather, because Commerce must now, for the first time in this case, adopt a test for determining "pervasiveness" under the *old* targeted dumping methodology.  They contend they explained to Commerce that for that purpose, it is reasonable to use the standard that is currently in use in differential pricing methodology.  *Cf*., note 21, *supra*.  The petitioners here argue that Commerce provided no reasonable explanation for why it should not utilize the Cohen's *d* test for the limited purpose of determining "pervasiveness,"

nor did Commerce explain why the test it actually used in the first redetermination -- which was essentially "we know it when we see it" -- is superior to the Cohen's *d* test.  For these reasons as well as ignoring the request of *Gold East II*, 39 CIT at ___, 991 F. Supp. 2d at 1369, they argue the second remand redetermination is unsupported by substantial evidence and is not in accordance with law.  Remedially, they contend the targeted dumping by APP-China should have been found "pervasive" and the exception to the Limiting Rule should have applied.  Petitioners' Comments on Second Remand Redetermination at 25.

### 2.  Analysis

The fact that the court did not rule  in *Gold East II* in favor of the petitioners on their targeted dumping arguments does not result in construing that they were ruled against.  The opinion simply did not reach their arguments.  Here, however, the court disagrees with the petitioners' premise that "pervasiveness" is a new issue that *Steel Nails* did not test for,  as Commerce explained that the *Steel Nails* test addresses that question.[27]

On the other hand, the agency's position is that it was necessary to apply the *Steel Nails* methodology because that was the test in effect at the time of the original investigation.  It is unclear from the papers whether that was by choice, or because Commerce believed it was compelled to do so in consequence of *Gold East I.  Cf.*, *e.g.*, Def's Resp. at 9-10. Either way, insofar

---

[27]  *See id*; *see also Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7308, 7350 (Feb. 27, 1996), and *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27375 (May 19, 1997) (Preamble) (it is appropriate to depart from the default rule when: (1) "targeted dumping by a firm is so *pervasive* that the average-to-transaction method becomes the best benchmark for gauging the fairness of that firm's pricing practices," or (2) "the targeted dumping practice is so *widespread* it may be administratively impractical to segregate targeted dumping pricing from the normal pricing behavior of the company") (italics added).

as APP-China is concerned, *Gold East I* only decided that the Limiting Rule was still effective for

purposes of the investigation.  Whether the record compels that the Limiting Rule be excepted is a

different matter, as the defendant also seems to recognize.  *Cf.*, *e.g.*, *id*.  As the matter stands,

Commerce's indication of the "proper" methodology to apply in order to answer that question

reveals a concept of administrative finality that is at odds with this court's general understanding of

that concept, pursuant to which the application of changes or developments in methodology with

respect to matters outstanding before the agency have generally been held appropriate -- indeed,

encouraged -- on the assumption that current methodology is the result of refinement, and interest

in the application of particular methodology generally does not "vest" without demonstrative reliance

upon it.  *See*, *e.g.*, *Ugine and Alz Belgium, N.V. v. United States*, 31 CIT 1536, 1553, 517 F. Supp.

2d 1333, 1347 (2007) ("[i]n the trade context, administrative finality attaches when entries are

liquidated, not when the administrative review closes"); *Brother Industries, Ltd. v. United States*,

15 CIT 332, 771 F. Supp. 374 (1991) (reliance must be evident from the record).  *Compare Final*

*Affirmative Countervailing Duty Determinations: Certain Steel Products From Mexico*, 58 Fed. Reg.

37352, 37355 (July 9, 1993) (explaining immediate application of change in how hyperinflation is

analyzed) *with British Steel PLC v. United States*, 127 F.3d 1471 (Fed. Cir. 1997) (upholding the

immediate application of that change as reasonably explained).  *Cf. also*, *e.g.*, *Tung Mung Dev. Co.*

*v. United States*, 354 F.3d 1371, 1378-79 (Fed. Cir. 2004) (any errors in remand orders do not

survive ITA decisions to adopt a new policy; the Supreme Court "has repeatedly emphasized[ ] the

*Chevron* doctrine contemplates that agencies can and will abandon existing policies and substitute

new approaches" as necessary, including on remand); *SKF USA Inc. v. United States*, 254 F.3d 1022,

1030 (Fed. Cir. 2001) ("an agency must be allowed to assess 'the wisdom of its policy on a

continuing basis'", quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467

U.S. 837, 864 (1984)); *Allegheny Ludlum Corp. v. United States*, 367 F.3d 1339 (Fed. Cir. 2004)

(discussing new methodologies applied on remand to Commerce); *Union Steel Manufacturing Co.,

Ltd. v. United States*, 36 CIT ___, ___, 837 F. Supp. 2d 1307, 1323-24 (2012) (granting voluntary

remand to reconsider cost-recovery methodology in light of intervening case law); *United States

Steel Corp. v. United States*, 36 CIT ___, Slip Op. 12-48 (Apr. 11, 2012) at 8 ("[t]o the extent [the

defendant] is arguing ITA's hands were tied by a 'record rule' vis-à-vis application of its new policy

to a matter remanded for reconsideration, the argument misstates the law") (citations omitted), *aff'd*,

500 Fed. Appx. 948 (Fed. Cir. 2013); *AG der Dillinger Huttenwerke v. United States*, 26 CIT 298,

319, 193 F. Supp. 2d 1339, 1361 (2002) ("under its own practices, Commerce may choose or not

choose to apply current law in a review *as circumstances warrant*" and remanding for findings to

support refusal to apply then-current methodologies ) (italics added); *id.*, 26 CIT at 320, 193 F. Supp.

2d at 1362 (further remanding refusal to consider altering change-of-ownership methodology on

grounds articulated).[28]   It may be the case that Cohen's *d* is not better suited to answering the

---

[28]   It is also noted that Commerce also had the authority on remand to depart from
"established" methodology so long as it reasonably explains the circumstances that compel that
departure, as the petitioners imply -- *e.g.*, *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1328
(Fed. Cir. 2009) ("[o]nce Commerce establishes a course of action . . . Commerce is obliged to
follow it until Commerce provides a sufficient, reasoned analysis explaining why a change is
necessary") -- and Commerce implicitly argued that its then-existing targeted-dumping methodology
should not even be considered "established" despite its public announcement in 1997.  *Cf.
Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty
Investigations*, 73 Fed. Reg. 74930, 74930-31 (Dec. 10, 2008) ("Until recently, there have been very
few allegations or findings of targeted dumping.  This situation has caused the Department to
question whether, in the absence of any practical experience, it established an appropriate balance
(continued...)

"pervasiveness" question in accordance with Commerce's prior regulation than its *Steel Nails* test, but analysis of pervasiveness appears distinct from the "normal" targeted dumping "remedy" articulated in the Limiting Rule.  Further clarification from Commerce is therefore requested.

*Conclusion*

In view of the foregoing, the case needs to be remanded a third time.  Results shall be due July 10, 2015.  As soon as practicable after such results are docketed, the parties shall confer on filing a joint status report or proposed scheduling order for comments, if any, on the results of remand, and the plaintiffs shall apprise the Clerk of the Court of such efforts in writing by close of the fifth business day thereafter.

**So ordered.**

/s/  R. Kenton Musgrave
R.  Kenton Musgrave, Senior Judge

Dated: April 22, 2015
       New York, New York

---

[28] (...continued)
of interests in the provisions.  The Department believes that withdrawal of the provisions will provide the agency with an opportunity to analyze extensively the concept of targeted dumping and develop a meaningful practice in this area as it gains experience in evaluating such allegations."  73 Fed. Reg. at 74930-31.  But to the extent that implies Commerce has had the ability to "moot" the application of the Limiting Rule during this proceeding all along, that still does not translate to procedural "harmless error" in that rule's withdrawal without proper notice and comment.  *Cf., e.g.*, *Consumer Energy Council of America v. FERC*, 673 F.2d 425, 445-48 (D.C. Cir. 1982) (litigation not mooted by revocation not in compliance with APA notice and comment).  *Cf. Gold East I.*